**A.C. COLLINS FORD, INC., Mignon P. Collins, Independent Executrix of the Estate of A.C. Collins and Mignon P. Collins, Individually, Appellants,**

v.

**FORD MOTOR COMPANY, Appellee.**

No. 08–90–00089–CV.

Court of Appeals of Texas, El Paso.

Dec. 19, 1990.

Rehearing Overruled Feb. 20 and March 20, 1991.

writ); *LeBlanc v. LeBlanc,* 761 S.W.2d 450, 454 (Tex.App.—Corpus Christi 1988), *writ denied per* *curiam,* 778 S.W.2d 865 (Tex.1989).

Jack G. Carnegie, Holtzman & Urquhart, Houston, Tex., for appellants.

Deborah A. Verbil Gilpin, Paxson & Bersh, and Lee L. Kaplan, Baker & Botts, Houston, Tex., for appellee.

Before OSBORN, C.J., and FULLER and KOEHLER, JJ.

## OPINION

OSBORN, Chief Judge.

This is an appeal from a summary judgment denying recovery sought by an automobile dealer from the vehicle manufacturer resulting from the manufacturer's refusal to permit the dealer the right to relocate his operations from a location in Pasadena, Texas to the Gulf Freeway. We affirm.

A.C. Collins (now deceased) was an employee of Ford Motor Company from May 1, 1956 to September 30, 1967. He left the company and for two years was the general manager for a Ford dealer in Houston. In 1969 Collins bought the Ford dealership located at 1616 South Richey in Pasadena, Texas and became the principal owner of A.C. Collins Ford, Inc. Within a few years as business declined, he requested the right to relocate his dealership on the Gulf Freeway between Houston and Galveston in the vicinity of the Almeda Mall. It was his belief that his dealership should be in a high traffic area on the freeway and near a major shopping center. Under the terms of his dealership agreement with Ford, the manufacturer retained the right to approve a dealership location but included an "expressed intention to deal fairly with its dealers,...." Ford made periodic growth studies to determine the proper location or relocation for its dealerships. Houston area market studies were made in 1973, 1977, 1980, 1983 and 1985.

Mr. Collins in his deposition testified that the area where his company was located began to deteriorate with a general economic decline in automotive sales in 1974. On February 25, 1974 he wrote to Mr. R.E. Parr, District Sales Manager for Ford, requesting approval to relocate this dealership. In that letter he noted the rapid deterioration of his location, both facilities and area, and said he felt "that the only advantageous site would be in the vicinity of the Almeda Shopping Center." In September 1974, Mr. Collins received a report from Vallone and Associates, Realtors, which reflected a traffic count on South Richey of 14,635 cars per day compared to a count of 61,620 on the Gulf Freeway. He was advised as to 20 acres that was available at a cost of $784,080.00. On April 16, 1975, Mr. Collins again wrote to R.E. Parr, requesting approval for relocation on 20 acres on the Freeway. He was advised by Mr. Parr that Ford's studies showed that there was no need to move at that time. Mr. Collins did not agree with that decision and felt it was wrong. In April 1976, Mr. Parr wrote to A.C. Collins and said, "[r]elocation to the Gulf Freeway would not be in the best interests of the Pasadena automobile buying public or the Houston metropolitan market representation pattern. Thus, your request for relocation out of your primary market area to the Gulf Freeway must be denied." The letter suggested he could "search out an alternate location within your primary market area...." In October 1977, Mr. Collins wrote to A.T. Buddin, District Sales Manager for Ford concerning loss of part of their frontage area on Richey Street. He wrote, "[i]nasmuch as the results of the Market Study indicate we should stay where we are for the foreseeable future, it appears our problems will only get worse." He mentioned the possible relocation to a former Dodge automobile facility on a ten-acre tract near his then existing location. Later, Mr. Collins was told that Ford would not authorize a move to the Freeway, but would agree for him to move a couple of blocks to the former Dodge facility in order to have more space for his operations. That move was made in December 1978. With regard to that move, he testified, "I knew it was wrong to move there. I told them. I begged and I pleaded and got on my knees. And I'm really not that type of fellow." He said he was told by the people at Ford, "we need representation in Pasadena." He said in his deposition:

Q Now, did you disagree with what they were saying about the need to serve Pasadena?

A Certainly, yes, sir.

Q You knew they were wrong?

A No question about it.

. . . . .

Q So, it was clear to you even back then that their system of evaluating the information and the kind of information they looked at was flawed?

A In my case, yes. I can't talk about others.

. . . . .

Q Anything else that makes you think that Ford actually knew by early 1977 that you should have been relocated?

A Nothing that I haven't stated that I can think of.

Q Now, are you saying that before then you suspected Ford knew you ought to relocate, but you didn't and they just weren't going to let you?

A I knew I should have been relocated.

Q I understand that you knew that you ought to be relocated.

A Yes.

Q And you knew that from the beginning, right?

A Yes, sir.

With regard to the market analysis that Ford performed periodically, it was clear to Mr. Collins that there were defects in their studies and conclusions. In his deposition he testified:

Q In 1977, you knew they hadn't driven the market and didn't know anything about the market?

A It's in your records, sir, yes.

Q And in 1980, it's clear to you they didn't know anything about your market and they were just wrong and that they hadn't driven the market?

A Yes.

Q And you knew that in, I guess, all the years in between and all the time up to 1985?

A In my mind, yes.

On January 2, 1985, Mr. Collins wrote to Mr. Ryan and said among other things, "[t]his is to put you on formal notice that I will wait no longer.... When the company relocated me ½ block from my old dealership I went on record and stated that Richey street was deteriorating and the traffic count was less than 10,000 per day and that I should be moved to the Gulf Freeway with 100 to 150 thousand traffic count. This is a matter of Ford Motor Company record." Following a meeting with Mr. Ryan on January 11, 1985, Mr. Collins wrote a follow-up letter four days later. He summarized his problems beginning with his move in 1978 which he said he protested but was overruled by Ford. He noted that he had at that time offered to take an option on 29 acres across from the Almeda Mall. With regard to the three options discussed including staying at his present location, relocating at Beltway 8 and Spencer and relocating on the Gulf Freeway in the Almeda area, he wrote, "[t]his, by the way, is what I wanted to do with the 29 acres that I wanted to relocate to 6 years ago." In February 1985, Mr. Collins received a letter from a new District Sales Manager, M.J. Ellsworth, indicating the decision to relocate his dealership at its present site was a sound decision based on information available at that time and indicating that based on current information, which he included, there should be no relocation at that time. Mr. Collins responded by return mail. He was emphatic when he wrote:

I must reiterate that my position is worsening. I have fought this relocation problem since early 1974. The company made a mistake when they refused to allow me to relocate to the Gulf Freeway in 1975 and 1978 and relocated me one half block from my old location which was deteriorating even then.

I was right, they were wrong—I expect the Ford Division of the Ford Motor Company to admit their error and rectify this situation without further paper shuffling and delay.

This got a response from the vice president for sales operations. He agreed to an immediate review of the market conditions and the Gulf Freeway site. A meeting was held on April 30, 1985 between representatives of Collins Ford and Ford Motor Company. Mr. Ellsworth indicated a need for a full-blown market survey of the entire Metro–Houston area before a move could be approved. It was indicated such a survey could not be completed until near the end of 1985. At the conclusion of the meeting Mr. Collins indicated his intention to file suit unless Ford offered satisfactory restitution by May 10, 1985. The market study was concluded in October 1985 and Ford gave approval for Collins Ford to relocate in the Gulf Freeway area. Collins Ford still operates on Richey street pending final determination of a Texas Motor Vehicle Commission order which denied its application to move to the Gulf Freeway area.

■ This suit was filed in January 1986. It seeks to recover damages for breach of expressed and implied covenants of good faith and fair dealing, breach of fiduciary duty, fraud and deceit, violation of the Texas Deceptive Trade Practices Act, tortious interference with business relations, economic coercion and duress, negligence, conspiracy and breach of an implied warranty of good and workmanlike performance. The trial court granted summary judgment for Ford Motor Company and Collins Ford appeals with a single point of error which states, "[t]he trial court erred in granting Ford's motions for summary judgment." We recognize this is a perfectly valid point of error although we disagree with the reasoning which permits such an appellate practice in a case involving a transcript of over 1700 pages, a deposition of more than 1200 pages and 28 exhibits of several hundred pages. *See Texas Employers' Insurance Association v. Stodghill*, 570 S.W.2d 398, 402 n. 2 (Tex.Civ.App.—El Paso 1978), *reversed*, 582 S.W.2d 102 (Tex.1979).

At the time the motions for summary judgment were heard by the trial court

apparently it was agreed by all counsel that the two-year statute of limitations would be applicable to all of the causes of action. While this case has been on appeal the decision in *Williams v. Khalaf*, 802 S.W.2d 651 (1990) has recognized that as a result of legislative amendments suits for fraud and deceit are barred after four years and not two years.

 The issue on appeal from a summary judgment favoring a defendant is whether the movant established as a matter of law its entitlement to summary judgment by conclusively proving all essential elements of its defense as a matter of law. *Montgomery v. Kennedy*, 669 S.W.2d 309 (Tex.1984); *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671 (Tex.1979); *Menchaca v. Menchaca*, 679 S.W.2d 176 (Tex.App.—El Paso 1984, no writ). By moving for summary judgment on the basis of the running of limitations, Ford assumed the burden of showing as a matter of law that the suit was barred by limitations. *Delgado v. Burns*, 656 S.W.2d 428 (Tex.1983). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true, every reasonable inference from the evidence must be indulged in favor of the non-movant and any doubts resolved in its favor. *Montgomery v. Kennedy*. Where the discovery rule is raised to avoid application of the statute of limitations, the burden is on the non-movant to both plead and offer competent summary judgment proof raising that issue as an affirmative defense to the statute of limitations. *Smith v. Knight*, 608 S.W.2d 165 (Tex.1980); Hittner and Liberato, *Summary Judgments in Texas*, 20 St. Mary's L.J. 243 at 273 (1989). But, if the issue is raised in a summary judgment proceeding, the burden is on the movant to negate the discovery rule. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 n. 2 (Tex.1988).

 Applying those rules to the undisputed facts in this case, we concluded that this suit was barred by limitations when filed in 1986. This decision is based only upon the testimony and exhibits originating from A.C. Collins and the Appellant is bound by that evidence. Mr. Collins first requested a right to relocate in 1974. Ford denied that request. When he made a move in 1978, he knew it was wrong and he told the Ford people. As to Ford's decision being wrong, he concluded there was "no question about it." When he wrote to the Ford district sales manager in 1985, he continued to insist that the company had wrongfully refused to allow him to relocate on the Gulf Freeway in 1975. He also testified that he knew in 1977 that the Ford economic survey was faulty and that in 1980 it was clear that they were wrong. Even if there was fraud or deceit upon the part of Ford Motor Company and the four-year statute of limitations applies, Mr. Collins by his own admissions was aware of the conduct on the part of Ford more than four years prior to filing suit. His own testimony establishes that with regard to the discovery rule Mr. Collins knew in 1980 that the Ford survey was faulty and that it was clear to him that the company's refusal to authorize his relocation was wrong. Whatever cause of action Collins Ford had in 1986, it had in 1980 following the relocation on Richey Street rather than a relocation on the Gulf Freeway. His testimony in this regard was as follows:

Q How long did it take at this new location before you could see that it wasn't working, that it was just, you know, economically disastrous?

A I was sure of it, sir, in a year.

Q So, by 1980 you were sure it was a mistake, or by late '79?

A Yes.

If in 1980 he was aware that the new location on Richey Street was an economic disaster, Mr. Collins at that time knew or should have known of the facts giving rise to the cause of action for which suit was filed in 1986. *Tenowich v. Sterling Plumbing Co., Inc.*, 712 S.W.2d 188 (Tex. App.—Houston [14th Dist.] 1986, no writ).

We concluded that the trial court did not err in granting the summary judgment.

Point of Error No. One is overruled. The judgment of the trial court is affirmed.

## OPINION ON MOTION FOR REHEARING

■ As in its original brief, the Appellant has filed an excellent Motion for Rehearing. It initially urges that this Court erred in failing to reverse and remand for trial its claim of conspiracy because Ford did not assert limitations as a ground to bar that claim. We do not reach that contention.

Our initial opinion noted that the appeal was based upon a single point of error which asserted that the trial court erred in granting Ford's motions for summary judgment. That was a proper point of error under the holding in *Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119 (Tex.1970). Therefore, this Court considered the issues raised under that point of error. Under that point of error in the Table of Contents, as shown by the attachment to this Opinion, was a two page listing of the various issues to be raised in the brief for Appellant including fiduciary duty, express and implied covenants, Deceptive Trade Practice Act, duty of good and workmanlike performance and defenses of release and limitations. No mention is made of a conspiracy claim. The excellent brief of fifty pages cites no case dealing with a conspiracy claim. Under a heading dealing with a claim for breach of an implied warranty of good faith and workmanlike performance, the word conspiracy appears in one sentence. We conclude the issue has not been properly raised on appeal from the summary judgment.

This Court would urge the Supreme Court to reconsider its opinion in *Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119 (Tex.1970) and recognize that the time has come when attorneys should be able to direct an appellate court to the error of the trial court with such specificity that there is no question about the complaint on appeal. In this case, with a transcript of over 1700 pages, a deposition of more than 1200 pages and 28 exhibits, a single point of error saying the trial court erred is little help.

Each Court of Appeals in this state must pass upon hundreds of points of error each month. A very general point of error gives little help in disposing of that work load. The decision in *O'Neil v. Mack Trucks, Inc.*, 542 S.W.2d 112 (Tex.1976) that the Court cannot decide the case on the points presented but must decide the case on the argument raised does not help a busy court in the disposition of its case load. The more recent opinion in *Inpetco, Inc. v. Texas American Bank/Houston*, 729 S.W.2d 300 (Tex.1987) is even less help. In that case, the Court held that the Court of Appeals erred in affirming the trial court on the basis of Inpetco's briefing inadequacies without first ordering Inpetco to rebrief. Its application has not been uniform. D. Gunn, *Unsupported Points of Error on Appeal*, 32 S.Tex.L.Rev. 105 (1990) at 121 et. seq. When that right to rebrief was presented to the Supreme Court in *Davis v. City of San Antonio*, 752 S.W.2d 518 (Tex. 1988), the Court said the request comes too late.

■ In *San Jacinto River Authority v. Duke*, 783 S.W.2d 209 (Tex.1990), the Court, in relying upon Rule 52(a) of the Texas Rules of Appellate Procedure, noted that in order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the *specific grounds* for the ruling. Is it too much to expect that same party to present *specific grounds* in points of error when the appeal is perfected?

Perhaps the *Napier* case was justified in 1970. At that time, the courts of appeals had no criminal jurisdiction and the volume of cases was substantially less than it is in 1991. Today when the State Bar of Texas has an outstanding appellate practice section with an excellent practice course each year, when attorneys are charging hun-

dreds of dollars on an hourly rate and when fees are in the thousands of dollars for appeals in most cases, are we to continue to act as if appeals were perfected by laymen and not professionals? See *Texas Employers' Insurance Association v. Stodghill,* 570 S.W.2d 398, 402 (Tex.Civ. App.—El Paso 1978), *reversed,* 582 S.W.2d 102 (Tex.1979). We respectfully urge that the *Napier* holding be reconsidered.

We have considered the arguments presented in the Motion for Rehearing and the Motion is overruled.

APPENDIX

TABLE OF CONTENTS

Page

Preliminary Statement
Point of Error
Background Facts ....................................................... 1
Argument and Authorities .............................................. 6
I. Introduction ...................................................... 6
II. Trial Court Erred in Granting Ford's Motion for Summary Judgment... 8
 A. There is a Fact Issue As To The Existence of A Fiduciary Duty From Ford to A.C. Collins ......................................... 8
 B. A.C. Collins Can Recover Under Express and Implied Duties of Good Faith and Fair Dealing ...................................... 13
 1. Express Covenants ......................................... 13
 2. Implied Covenant .......................................... 15
 C. Collins Can State A Claim Against Ford for Negligence ........... 16
 D. A.C. Collins Has A Viable Claim Under the DTPA ............... 21
 1. Michigan law does not allow Ford to Circumvent the DTPA ... 21
 2. To be covered by the DTPA, it is not necessary that the misrepresentations be made before the contract was signed ......... 23
 3. Mischaracterization of the evidence will not entitle Ford to summary judgment nor can Ford shift the burden of summary judgment proof ............................................... 24
 E. A.C. Collins Can State A Claim Against Ford For Breach of Duty of Good and Workmanlike Performance of Services ................ 26
 1. A.C. Collin's Claim Is Not Barred By Ford's Earlier Filed Motion for Summary Judgment ..................................... 26
 2. A.C. Collin's Allegations State A Claim for Breach of the Implied Warranty of Good and Workmanlike Performance ........... 26
 F. A.C. Collins Is Not Barred By the Release ...................... 28
 1. Lack of Consideration ..................................... 28
 2. Fraudulent Inducement .................................... 31
 G. A.C. Collins' Claims Are Not Barred By Limitations .............. 33
 1. Ford Has Not Proven As A Matter of Law That A.C. Collins' Claims Are Barred ........................................ 33
 2. Ford Mischaracterizes Collins' Claim ....................... 34
 3. The Tort Was Not Complete and No Cause of Action Accrued in 1976 ...................................................... 36
 4. A.C. Collins Was Not Aware of Ford's Fraudulent or Negligent Misrepresentations in 1976 ................................. 38
 5. Ford Fraudulently Concealed Its Tortious Conduct ............ 41
 6. A.C. Collins Did Not Discover Ford's Tortious Conduct Until February 1985 ................................................ 45
 7. Each of Ford's Marked Studies And Misrepresentations Constitutes An Independently Actionable Tort ..................... 47