**Cherie Kay PANKOW, Individually and as Temporary Administratrix of the Estate of Steven Paul Pankow, Appellant,**

v.

**COLONIAL LIFE INSURANCE COMPANY OF TEXAS and Colonial Savings and Loan Association, Appellees.**

No. 07–95–0080–CV.

Court of Appeals of Texas, Amarillo.

Oct. 7, 1996.

Rehearing Overruled Nov. 20, 1996.

Engel, Jones, P.C., Madison R. Jones, Houston, for appellant.

Cherie K. Pankow, Cypress, Pro Se.

Collyn A. Peddie, P.C., Collyn A. Peddie, Houston, for appellees.

Before DODSON, BOYD and QUINN, JJ.

QUINN, Justice.

Cherie Kay Pankow, individually and as the temporary administratrix of her deceased husband, Steven Paul Pankow, (the Pankows) appeals from a final summary judgment entered in favor of Colonial Life Insurance Company of Texas (Colonial Life) and Colonial Savings and Loan Association (Colonial Savings). In point one, Pankow states that the trial court erred in granting a "partial summary judgment on the issues of Insurance Code violations as to Appellee Colonial Insurance ... and on the issue of breach of

warranty as a basis for violation of the Deceptive Trade Practices Act." In point two, she contends that the court erred in "granting Appellees [sic] special exceptions concerning Insurance code [sic] violations, implied warranty, and deceptive trade practices act." In her last point, she contends that the court erred in "granting final summary judgment in favor of Appellees, because Appellees did not show there was no genuine issue as to any material fact and that Appellees were entitled to judgment as a matter of law...." We affirm in part and reverse in part.

### a. Statement of Facts

The Pankows obtained a mortgage loan from Colonial Savings and purchased a credit life policy from Colonial Life to pay the mortgage should either Pankow die. Payments were made upon both obligations until the fall of 1984 when the Pankows defaulted. In November of 1984, Colonial Life sent them a letter stating that the policy had lapsed for nonpayment.

In December of 1984, an attorney/agent of Colonial Savings, Oliver Guiberteau, met with the Pankows to discuss the default. At the meeting, Guiberteau allegedly represented to them that he had the authority to reinstate both the loan and insurance and that both would be reinstated. Thereafter, they paid him the total sum he requested and executed an agreement curing the default.[1]

Several weeks passed before the Pankows received two sets of coupon books representing their monthly mortgage payments. One set demanded payment of an amount equal to their mortgage and life insurance premium; the coupons in this set also contained the notation "includes insurance." The other omitted the premium. When Ms. Pankow allegedly called Colonial Savings to verify which coupons to use, she was told "to use the 'includes insurance' coupon," which she did.

On March 5, 1985, Colonial Life sent the Pankows a letter informing them that though their policy had been cancelled last fall, Colo-

---

1. This agreement contained a general reference to insurance. Whether that meant the credit life or some other, such as property or casualty, is unknown.

nial Savings had resumed sending it their premiums. Thus, to reinstate the policy, the writer disclosed, they "need[ed] the enclosed reinstatement form signed and returned to this office." The letter was signed by "Wanda Spoonemore, Policyowners Service." Ms. Pankow allegedly phoned Spoonemore who told her that "there was some confusion on their [Colonial Life's] part, that they had received the payments of insurance premiums and that the insurance would be reinstated."

Additionally, Ms. Pankow, on behalf of her husband, executed and returned the reinstatement form to Colonial Life on or about March 24, 1985. Before doing so, however, she received from the insurer a check for $240.30, representing a refund of six premiums. She cashed the item, though she purportedly "did not understand why" it was sent.

On April 1, 1985, Dell Hammonds, Marketing Plans Manager for Colonial Life, also wrote Pankow.[2] In her letter, she noted that the policy had lapsed and that the premiums had been refunded to her. Nevertheless, she was told that it could be reinstated for "$240.30 plus 3 more months premium for a total of $360.45." Pankow called Hammonds. During their conversation, Hammonds was told that she "did not have the required amount of cash . . . ." She replied that "there was an amount of money in the mortgage escrow account with Colonial Savings which could be used for that purpose." Pankow then "asked [her] to go ahead and apply the escrow funds to the life insurance premium by transferring it." Hammonds said "that [she] would do so."[3]

On May 22, 1985, Laura Tudor, Customer Service Representative for Colonial Savings, allegedly sent Pankow a third letter concerning the insurance. Earlier that month, Pankow had called Colonial Savings to inquire if the premiums had yet been transferred from escrow to Colonial Life. Tudor replied, by letter, "that the life insurance was dropped

several months ago," that the new mortgage payment would be $1106.75, and that any overpayments had "gone to the escrow account." Furthermore, there existed an "escrow overage of $1466.83." Pankow attested that she "did not receive [Tudor's] letter . . . prior to the death" of her husband "or at any time until after . . . suit commenced, and was unaware of it."

On June 4, 1985, Ms. Pankow again called Colonial Life and asked that it draft the escrow account in an amount equal to the total premiums due. She also told the individual with whom she spoke that her husband was in good health. Colonial Life apparently complied as evinced through a corporate memo containing the phrase "reinstated policy." Nevertheless, the company refused to satisfy the Pankow mortgage after it discovered that Mr. Pankow had actually died a day before Pankow placed the June 4th call.

### b. Waiver of Argument

Though mentioned in her points of error, the claims regarding "breach of warranty as a basis for violation of the Deceptive Trade Practices Act" and "Appellees [sic] special exceptions concerning Insurance code [sic] violations, implied warranty and deceptive trade practices act" went undeveloped in her brief. In other words, she cited neither argument nor authority in support of them. Thus, those specific complaints were waived. *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 637 (Tex.App.—San Antonio 1993, writ denied) (holding that points of error supported by neither argument nor authority are waived).

Nor did Pankow cite argument or authority concerning the trial court's decision to reject her claim of negligence or gross negligence. Thus, we will not review the trial court's action *vis-a-vis* those causes of action. *Id.; A.C. Collins Ford, Inc. v. Ford Motor Co.*, 807 S.W.2d 755, 760 (Tex.App.—El Paso

2. Hammonds had previously communicated with the Pankows as "Insurance Administrator" for Colonial Savings. As such she wrote them a letter soliciting them for "mortgage protection with accidental death insurance."

3. In a separate affidavit, Pankow stated that she too represented that "there was some confusion on their part, that they had received the payments . . . and that the insurance would be reinstated."

1990, writ denied) (holding that an appellant waives attack upon those issues encompassed by a summary judgment but unaddressed in the brief). Indeed, after liberally construing her brief, we conclude that the only contentions given any semblance of discussion involve the purportedly deficient notice of the June 21, 1991 summary judgment hearing, breach of the insurance contract and misrepresentation. So, our review is limited to addressing the trial court's action with regard to them.

### c. Summary Judgment Hearing—Adequacy of Notice

■ Pankow contends that she was not accorded twenty-one days prior notice of the June 21, 1991 summary judgment hearing. Though raised below, the objection was not accompanied by a motion to continue or an affidavit describing the reasons precluding her from presenting facts essential to defeating summary judgment. Having failed to file either document, they "may not successfully challenge the summary judgment solely on the ground that ... [they] had no advance notice of the hearing date." *Lofthus v. State*, 572 S.W.2d 799, 800 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.); *see Manhattan Constr. Co. v. Hood Lanco, Inc.*, 762 S.W.2d 617, 619 (Tex.App.—Houston [14th Dist.] 1988, writ denied) (holding that the issue is not preserved if the complainant received notice, appeared at the hearing, and failed to move for continuance and file an affidavit "stating reasons precluding the presentation of facts essential to its opposition to summary judgment"). This is especially so when the motion to be heard was identical to one previously heard but on which the court never acted. And, that was the circumstance here.[4]

### d. Breach of Contract

It is undisputed that the insurance policy lawfully terminated for want of payment in the fall of 1984. So, before the Pankows could claim that either Colonial Life or Sav-

ings breached it, they had to prove at trial that the contract had been reinstated. According to the Colonial companies, via their summary judgment motions, the complainants could not. Indeed, the two companies tendered evidence establishing the policy and its terms. Moreover, one such term demanded that the insured provide the insurer with evidence of insurability and pay all past due premiums as conditions to reinstatement. Conceptually, the situation could be likened to an offer to reinstate which require a specific mode of acceptance. If not so accepted, then no contract arose. *See Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex.1995) (holding that "[w]here an offer prescribes the time and manner of acceptance, those terms must ordinarily be complied with to create a contract"). And, according to Savings and Life, neither prerequisite was completed before Steven Pankow's death.

### 1. Guiberteau Transaction

■ As to Guiberteau, it is undisputed that though the Pankows may have paid him the outstanding premiums they did not give him the requisite proof of insurability. So, the offer to reinstate was not accepted, during the December 1984 transaction, via the mode dictated in the policy.

Nevertheless, the Pankows alleged that Guiberteau had the actual or apparent authority to reinstate the insurance by other means. Yet, to succeed in their argument, it was incumbent upon them to show (that is, present evidence raising a material question of fact) that he was granted authority by Colonial Life to deviate from or alter the terms of the policy restrictions. But, they did not. Indeed, the policy itself negated Guiberteau's actual authority to undertake the necessary modifications. According to its terms, that power lay with the insurer's president, vice-president, secretary and assistant secretary, and the summary judgment evidence submitted by the Pankows revealed

---

**4.** Though Pankow suggests that the court denied the previous motion, the record contains nothing which reflects that. Instead, it appears that the court may have orally voiced its proposed action but did nothing to manifest it in writing. In that

situation, the subsequent motion could be construed as a reminder to the court to do something. This seems especially so where the opposing party, like Pankow here, acknowledged that the movant presented no new evidence.

him to be an attorney or agent for Colonial Savings.

■ Similarly, the record is devoid of evidence illustrating that *Colonial Life* did anything to lead a reasonably prudent person to believe that Guiberteau had the power he allegedly said he had. *See Maccabees Mut. Life Ins. Co. v. McNiel*, 836 S.W.2d 229, 232 (Tex.App.—Dallas 1992, no writ) (holding that apparent authority arises when the *principal's* own conduct would lead a reasonable person to believe that the agent had the authority that he purported to exercise). Furthermore, Guiberteau's own statements could not fill that void. *Id.* at 232–33 (holding that only the principal's conduct is pertinent).

### 2. *Spoonemore and Hammonds Discussions*

■ As to the exchanges with Hammonds and Spoonemore, it is undisputed that before the Pankows delivered the evidence of insurability (that is, the reinstatement form) to Colonial Life, she received and cashed the premium refund check. So too is it undisputed that Mr. Pankow died before the outstanding payments were made. Thus, the offer to reinstate again was not accepted in the manner required by the policy.

Next, none of the summary judgment evidence indicated that either Hammonds or Spoonemore fell within the category of officers expressly permitted to waive policy terms. Similarly absent was probative evidence of conduct undertaken by *Colonial Life* on which one could base apparent authority. Indeed, the only semblance of such evidence is contained in the March and April 1985 letters to the Pankows. Though headed with the name of the insurer, which suggests that the stationary was provided by Colonial Life, they were signed "Wanda Spoonemore, Policyowners Service" and "Dell Hammonds, Marketing Plans Manager." Additionally, the information imparted therein, regarding reinstatement of the policy, comported with that found in the policy. Finally, while the posts held by the individuals undoubtedly

encompassed authority to act on behalf of Colonial Life in some degree, nothing illustrated that it included the power to change policy terms. *See, e.g., Maccabees Mut. Life Ins. Co. v. McNiel*, 836 S.W.2d at 233 (holding that though the insurer admitted that Whyburn was employed as a group sales representative who discussed with others a group life policy, that alone was "insufficient to prove that [he] acted with apparent authority to bind coverage and waive policy provisions").[5]

In sum, the Colonial companies established, as a matter of law, that the Pankows failed to reinstate the policy as per its own terms. Additionally, the Pankows failed to present relevant evidence creating a question of material fact regarding the authority of Guiberteau, Spoonemore, and Hammonds to modify those terms. Given that, no contract existed which could have been breached, and the Colonial companies were entitled to summary judgment on the claim.

### e. *Estoppel*

■ Despite the fact that the policy was never reinstated, the Pankows contended that Colonial Life was "estopped from asserting the policy was not in force at the date of death of ... Steven Pankow." In effect, they hoped to use the doctrine of estoppel to create a contract where none existed. This they cannot do. *See Hruska v. First State Bank*, 747 S.W.2d 783, 785 (Tex.1988) (holding that estoppel is defensive in nature and operates to prevent the loss of existing rights as opposed to the creation of liability where none previously existed); *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex.1965) (holding that estoppel does not create a contract where none existed before). One cannot estop a contract into existence. *Id.*

### f. *Misrepresentation*

Next, the Pankows argue that if the policy was never reinstated, then various employees of either Colonial company misrepresented material facts to them. Additionally, those

---

5. To the extent that the evidence indicates that Hammonds originally solicited the Pankows to buy insurance, the letter reveals that she did so under the auspices of Colonial Savings, not Colonial Life.

misrepresentations concerned the authority to reinstate and the fact of reinstatement.

### 1. By Guiberteau

■ Assuming *arguendo*, that Guiberteau did inform the Pankows that he had powers which, in fact, he did not, the misrepresentation was not actionable. Simply put, one cannot claim fraud when he knew that the false statement was indeed false. *Koral Indus. v. Security–Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex.1990), *citing, Dossett v. Franklin Life Ins. Co.*, 276 S.W. 1097 (Tex.Comm'n App.1925, judgm't adopted) and *Odom v. Insurance Co.*, 441 S.W.2d 584 (Tex.Civ.App.—Austin 1969), *affirmed,* 455 S.W.2d 195 (Tex.1970).

■ As shown above, the policy restricted the means by which it could be reinstated and vested the power to modify that procedure in a select few. The Pankows were charged, as a matter of law, with knowledge of those restrictions. *See Mid Century Ins. Co. v. H & H Meat Prod. Co.*, 822 S.W.2d 747, 750–51 (Tex.App.—Corpus Christi 1992, no writ) (stating that an insured will be deemed to know the contents of the contract he makes); *Shindler v. Mid–Continent Life Ins. Co.*, 768 S.W.2d 331, 334 (Tex.App.—Houston [14th Dist.] 1989, no writ) (stating that a claim for misrepresentation cannot stand when the party asserting the claims is legally charged with knowledge of the true facts). So, to the extent that Guiberteau may have told them that he could personally reinstate the policy through means other than those expressed in the policy, they knew, as a matter of law, that he could not. In other words, knowledge of the true facts,

as expressed in the contract, precluded them from relying upon his misstatement.[6]

### 2. By Hammonds and Spoonemore

■ Similarly, when Spoonemore and Hammonds allegedly uttered that the insurance was reinstated, the Pankows knew that the policy had been previously cancelled. And, again, they also knew, as a matter of law, the policy conditions concerning reinstatement. Since the Pankows had yet to perform both conditions (that is, return the proof of insurability form and pay the outstanding premiums), they knew that the statement had to be false. Consequently, it could not provide them a basis of recovery for misrepresentation. *See Mid Century Ins. Co. v. H & H Meat Prod. Co., supra; Shindler v. Mid–Continent Life Ins. Co., supra.* Simply stated, if the Pankows knew that A plus B were needed to equal C and that either A or B were missing from the equation, they could not rely upon someone's false statement that C exists. Holding otherwise would implicitly allow them to ignore their own knowledge of the truth, and that is something which the law will not condone.

■ Yet, the Pankows also contended that Hammonds and Spoonemore, as employees or agents of *both* Colonial companies, misrepresented in March and April of 1985 that the policy would be reinstated and that they would secure the transfer of monies from the escrow account to pay the outstanding premiums. Assuming, as we must for purposes of summary judgment, that such falsehoods were uttered and that Hammonds and Spoonemore were agents of both companies,[7] the representations differ in kind from those addressed above. They involved mis-

---

6. However, we reject the notion, proposed by the Colonial companies, that knowledge gained after the fact vitiates the fraud. Only knowledge gained before, or contemporaneously with, relying on the falsehood has that effect. *Odom v. Insurance Co.*, 441 S.W.2d 584, 590 (Tex.Civ. App.1969), *affirmed,* 455 S.W.2d 195 (Tex.1970) (stating that "if appellee ... knew that the answers contained in the application ... were false before or when the policy was issued then appellee would be estopped to rely on their falsity"); *see Dossett v. Franklin Life Ins. Co.*, 276 S.W. 1097, 1098–99 (Tex.Comm'n App.1925, judgm't adopted) (stating that fraud consists of a mis-

statement of fact which induces another to act which itself presupposes that the injured party relied on the statement). For example, if on day one, A induces B to buy a car via false statements regarding its condition and, after buying the car, B discovers that the statements were false, such knowledge does not prevent B from claiming that A defrauded him. In that situation, the element of reliance came to fruition before the truth was known.

7. This was not an issue presented below. So we cannot consider it here.

representations of a future act *which could be performed in compliance with policy terms.*[8] Again, when made by Hammonds in April of 1985, Ms. Pankow had already returned the proof of insurability sent to her a month before by Colonial Life. All that remained was for her to pay the outstanding premiums, and, according to the prospective insured, Hammonds represented that she would do that via a transfer from the escrow fund. Thus, the Pankows knowing that the policy was previously cancelled, that it could only be reinstated in one way, and that it was not reinstated as of April 1, did not effect their ability to rely upon the statement that it would be renewed and that the necessary steps would be completed by representatives of both companies.[9]

Moreover, the theory relied upon by the Colonial companies below and espoused in *Shindler v. Mid–Continent Life Ins. Co.,* that is, that one may not assert a claim for fraud based on misrepresentations occurring after the policy expired, was inapposite. In *Shindler,* as well as *Mid Century Ins. Co. v. H & H Meat Prod., Co.,* the insurance lapsed due to non-payment of premiums. Yet, no one actively attempted to cure the default despite knowing of their obligation to pay premiums. Thus, their inactivity coupled with the policy requirements demanding action prevented them from relying on post-termination comments insinuating that the insurance remained effective. Here, the Pankows undertook to complete those steps necessary to restore their insurance as per policy directive and representation by a Colonial Life employee.[10] Thus, the circumstances at bar removed the Pankows from the scope of *Shindler* and *Mid Century Insurance.*

8. Of course, it would have to be shown that Hammonds lacked the present intent to perform before the Pankows could successfully prove fraud. Yet, the absence of such intent was not raised as a ground for summary judgment. So we need not consider it.

9. That Colonial Life could cause the transfer of escrow monies held by Colonial Savings was illustrated by the "telephone dialogue" memo created on June 4, 1985. It disclosed that Pankow asked "Wanda," an employee of Colonial Life, to draft the account. Not only did the employee agree to do so after "clear[ing] with FWMC on overage of escrow" but she also

### g. Insurance Code Violations

The Pankows next contended that Colonial Life violated sections 21.20 and 21.21 of the Texas Insurance Code by attempting to cancel the renewed policy. Implicit within the allegation lies the element of reinstatement, that is, the policy had to have been reinstated before it could be cancelled. Yet, as discussed above and admitted by Pankows in their summary judgment evidence, it never was. Consequently, Colonial Life could not have violated the Insurance Code as alleged by the Pankows.

### h. Deceptive Trade Practices

■■■ The Pankows next contended that both Colonial companies violated the Texas Deceptive Trade Practices Act by breaching implied warranties and failing to transfer monies from the escrow account as represented by Hammonds. As to the former, and as previously discussed, they waived the matter by failing to brief it on appeal. As to the latter, both Colonial companies limited their attempt to bar recovery simply by invoking *Shindler.* Yet, we have held that case and its rule of law inapplicable to the present allegation. Because of this we cannot hold that any prior knowledge which the Pankows had regarding the truthfulness of prior distinct falsehoods prevented, as a matter of law, the alleged misrepresentation here at issue from being a producing cause of injury, if any.

Nor can we say, as a matter of law, that the Colonial companies established that the Pankows' own inaction after discovering that Hammonds failed to transfer the funds su-

"spoke with Jolene Cox [who] said it was OK [and] to send her copy of letter for file." Thereafter, Wanda wrote the notation "reinstated policy" on the face of the memo.

10. Whether Ms. Pankow knew that the monies had not been transferred before her husband died remains a question of fact. Apparently, she did contact someone with Colonial Savings in May of 1985 to investigate the subject, and Colonial Savings sent her a letter dated May 22, 1985, indicating that the monies had not been sent. Nevertheless, Ms. Pankow did not recall ever receiving the letter.

pervened or intervened to cause their injuries. Again, Ms. Pankow denied receiving the May 22nd correspondence from Colonial Savings prior to the death of her husband.[11] Thus, it remained a question of material fact as to 1) whether she knew that Hammonds failed to perform as promised before her husband died, and 2) acted in such a way so as to cause her own injuries, if any, assuming she had such knowledge.

### i. Contributory Negligence

To the extent that the trial court held the Pankows contributorily negligent, as a matter of law, that "affirmative defense" applies to the cause of negligence. Since the Pankows failed to address the latter on appeal, we need not determine whether the trial court acted appropriately. Suffice it to say, any contributory negligence on their part would not necessarily preclude recovery based on fraud of deceptive trade practices. *See Corpus Christi Area Teachers Credit Union v. Hernandez,* 814 S.W.2d 195, 198 (Tex.App.—San Antonio 1991, no writ); *Plains Cotton Co-op Assoc. v. Wolf,* 553 S.W.2d 800 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.).

Accordingly, the summary judgment is affirmed in all things except as to the allegations of fraud and deceptive trade practice arising from the misrepresentation that monies would be transferred from the escrow account to pay the outstanding premiums and as to the counterclaim of the Colonial companies. To that extent it is reversed and remanded for further proceedings.

---

11. The Colonial companies contended otherwise given that the Pankows' attorney referenced the May 22nd letter in correspondence he later drafted. The reference constituted an admission, according to Life and Savings, that she received the letter. Assuming *arguendo* this was so, the admission, nevertheless failed to encompass the date on which the letter was received. Had it been obtained by Ms. Pankow after her husband died, it can hardly be considered notice of Hammonds' default before he died.