COURT OF APPEALS









COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 




 
 
  
 RICHARD
 GLASSMAN AND LUCY GLASSMAN,
  
                             Appellants,
  
 v.
  
 SYLVIA PENA,
 DEWETTER HOVIOUS, INC., AND CHARLES DEWETTER, INDIVIDUALLY AND AS A LICENSED
 REAL ESTATE BROKER AND SPONSOR OF SYLVIA PENA,
  
                             Appellees.
 
 
  
 '
  
 '
  
 '
  
 '
  
 '
 
 
  
 No. 08-02-00541-CV
  
 Appeal from the
  
 County Court at Law No. 7
  
 of El Paso County, Texas
  
 (TC#2001-3260)
 
 




 

MEMORANDUM
OPINION

Richard and Lucy Glassman sued Sylvia
Pena, DeWetter Hovious, Inc., and Charles DeWetter (the appellees) for damages
arising from the purchase of a home.  The
Glassmans purchased the home from Cendant Mobility Financial Corporation.  Pena, a realtor with DeWetter Hovious, listed
the home for sale.  Charles DeWetter is a
broker with DeWetter Hovious and Pena=s supervisor.  The trial court granted the appellees= motion for summary judgment, and the
Glassmans appeal.  We affirm.








The
Glassmans= Petition

The Glassmans alleged that the
appellees misrepresented the size of the home.  
They asserted claims for violation of the Deceptive Trade Practices Act
(DTPA); common-law fraud; statutory real estate fraud; negligent
misrepresentation; negligent hiring, supervision, and/or management; and breach
of contract.

The Summary
Judgment Evidence

According to an affidavit by Richard
Glassman, Pena told him and his wife that the home was Aabout 5,500 square feet and that it
was over 5,000 square feet on a number of occasions.@ 
Glassman also averred, AWe would not have negotiated or purchased the house if we
thought it was less than 5,000 square feet and we believed that it was over
5,500 square feet because Sylvia Pena told us that it was.@

In her deposition, Pena admitted that
she told Richard Glassman that the home was over 5,000 square feet A[m]aybe a couple of times.@ 
Pena also stated that she knew that the size of the home was very
important to Richard Glassman.  According
to Pena, Ahe was always saying that@ the size of the home mattered to him.








In 1995, when the home was being
built, Pena listed it for sale in the Multiple Listing Service (MLS) as having
3,950 square feet.  She testified that
the builder probably anticipated that the home would be that size, and she
probably got the square footage information from him.  Pena listed the home for sale again in
1997.  At that time, she listed the home
as having zero square feet in the MLS. 
She explained that the owners had made changes to the home as it was
being built, and they were unsure what the true square footage was.  The home did not sell in 1997, so the owners
attempted to rent it out later that year. 
When Pena listed the home for rent in the MLS, she listed it as having
5,000 square feet, based on what the owners told her.  In 2000, when Pena listed the home for sale
for the last time, she listed it as having 5,767 square feet.  She obtained this figure from the tax
assessor=s office.

Pena testified that she was not under
the impression that the house=s size had changed since it was built.  But she also testified that when she placed
the final listing, she believed the home was 5,767 square feet.  Pena never reviewed the square footage
information in her prior listings, although the listings were still available
on the Internet and in the DeWetter Hovious office files.  At one point, Pena testified that when she
listed the house for rent at 5,000 square feet it occurred to her that this
square footage was different from what she had previously listed it as.  But she later testified that she did not
remember that the square footage was less in the prior listings.

On March 11, 2001, the Glassmans
signed three documents related to the home purchase--a ANotice to Purchaser,@ a AStandard Addendum,@ and a ASeller=s Real Estate Disclosure.@ 
The Notice to Purchaser is a two-page document that contains the
following provisions relative to this dispute:








Buyers
expressly acknowledge . . . that they are purchasing the property . . . upon
their own examination and judgement and that BROKERS AND AGENTS INVOLVED
HAVE MADE NO REPRESENTATIONS, STATEMENTS, OR CLAIMS TO THE PROPERTY CONDITIONS
OR BOUNDARY LINES UPON WHICH BUYERS ARE RELYING.  Buyers acknowledge that the real estate
brokers and agents involved in this sale are acting only as CONDUITS OF
INFORMATION PROVIDED TO THEM BY OTHERS and are not responsible for the validity
or verification of such information to include that which is provided by the
seller, or for the actions or failure to act of any other persons involved in
this transaction.

 

.   .   .

 

SIZE
OF THE PROPERTY If square footage of
the property is of importance, buyers have the right to request an opportunity
to determine the size of the property prior to submitting a written offer, or
to insert language in the proposed earnest money contract making the purchase
subject to proof that the property contains square footage acceptable to them.  If buyers do not do so, they acknowledge the
square footage is not a significant factor in their decision to buy the
property.  Buyers understand it is their
sole responsibility to make their own determination of the number of square
feet in the property, or employ any qualified person of their choosing to do
so, and this responsibility is not affected by any statement regarding square
footage they may have seen or heard from any source.

 

.   .   .

 

Buyers
acknowledge that neither the seller, nor brokers or agents involved in this
transaction have made any oral agreement, representation, promise or warranty
concerning the property which adds to, alters, or is in conflict with the
written terms of the Earnest Money Contract and any Addenda, this Notice and
any other written notices provided to the Buyers.

 

The Standard Addendum is a two-page document that contains
the following provision:

Condition:








Buyer(s)
acknowledge that Seller has acquired the property in a relocation transaction,
and that Seller is acting in the capacity of a non-occupant contractual owner
or representative of the owner and has limited first-hand knowledge of the
property.  . . . .  Neither Seller nor Seller=s agent has made any warranties or representations,
either expressed [or] implied (except as may have been given to the Buyer(s) in
writing), as to the condition of the premises. 
No representations [or] warranties made by seller shall survive the closing.  Buyer(s) acknowledge that they have the
opportunity to inspect [the] property or have the same inspected by others on
their behalf.  Except for any repairs
specifically required to be made [by] Seller in accordance with the terms of
this Agreement, or attached hereto, Buyer(s) understand that they are
purchasing [the] property in AAs-Is@ condition, subject only to any specific items set
forth in this Agreement.  

 

The Seller=s Real Estate Disclosure is a
one-page document that lists the various disclosure documents that Cendant had
provided the Glassmans.  This document
also contains the following language:

Buyer(s)
acknowledge and agree that the purchase price of the property and other terms
and conditions of this purchase agreement were negotiated with full knowledge
and disclosure of the contents of the aforementioned disclosures; that said
purchase price reflects the agreed-upon value of the property AS IS; including
the aforementioned disclosures; to take the property subject to the
disclosures; and that Cendant Mobility shall have no responsibility or
liability therefor.    

 

On March 21, 2001, the Glassmans
signed a nine-page earnest money contract.  
Under the heading APROPERTY CONDITION,@ the contract restates the
information in the Standard Addendum regarding Cendant=s acquisition of the property in a
relocation transaction and states that the buyers have received copies of the
disclosure documents.    The contract
then provides:








Buyer
acknowledges that Buyer has had, or will have had, prior to closing, the
opportunity to investigate the subject matter of the aforementioned disclosures
on their own and have, or will have, investigated such to their satisfaction,
or waived such investigation.  Buyer will
at closing execute a Disclosure Acknowledgment to confirm that Buyer has had
the opportunity to review and investigate the contents of the disclosure.  Buyer acknowledges and agrees that the Sales
Price of the Property and other terms and conditions of this contract were
negotiated by Buyer and Seller with full knowledge and disclosure of the contents
of the disclosures; that the Sales Price reflects the agreed-upon value of the
Property AS IS; including the disclosures; to take the Property subject to the
disclosures; and that Seller will have no responsibility or liability therefor.  Buyer acknowledges, that neither Seller nor
Seller=s agent has made any warranties or representations,
either expressed or implied (except as may have been given to the Buyer in
writing), as to the condition of the premises. 


 

The Glassmans deposited
$20,000 as earnest money.

 

According to Richard Glassman=s affidavit, he and his wife have
never held real estate licenses, nor do they have any education in buying and
selling real estate.  Lucy Glassman is a
homemaker and Richard Glassman runs a small grocery store.  The affidavit states that neither of the
Glassmans read the paperwork related to the home purchase.  The affidavit further states, AI doubt I would have been able to
understand it if I had tried to read it and, certainly there wasn=t enough time to read it in just one
day . . . .@ 
Richard Glassman believes they signed or initialed at least thirty
pages.  The pages had small print, and he
did not notice Aany particularly large print or writing that caught [his]
attention.@

After they signed the earnest money
contract, but before closing, the Glassmans had the home appraised.  Richard Glassman testified that the appraiser
determined that the home is about 4,500 square feet or something in the A[l]ow fours.@ 
After they received the appraisal, the Glassmans no longer wanted to
purchase the home.  According to Richard
Glassman, their realtor contacted DeWetter Hovious and was told that Awe could not get out on that basis,
there=s no way, no how.@








The summary judgment evidence also
included an MLS listing input form, signed by Pena and the owner, which states
that the home is 5,767square feet, and a printout of the MLS listing, which
contains the following entries:  ASqFt: 5,767@ and ASource Sq Ft: ASSR TAX ROLL.@

The Summary
Judgment Motion

The appellees filed a no-evidence
summary judgment motion.  Regarding the
breach of contract claim, they argued that there was no evidence of a
contractual relationship between the Glassmans and the appellees.








Regarding the remaining claims, the
appellees argued that the Glassmans cannot establish that they relied on any
misrepresentation or that any misrepresentation caused their damages, because
they signed the Notice to Purchaser containing the ASize of the Property@ disclaimer and the three other
documents containing Aas is@ clauses.  The
appellees also argued that they were not liable for any misrepresentation
because the prior owner signed the MLS input form that contained the erroneous
square footage figure.   They based this
second argument on section 15F of the Texas Real Estate License Act (TRELA),
which according to the appellees, provides that a realtor who relies on a
misrepresentation made by a seller, without knowledge of the inaccuracy of the
representation, is shielded from liability in connection with the
misrepresentation.[1]            Regarding the DTPA claim, the
appellees also argued that the Glassmans could not establish that they relied
on any misrepresentation regarding the square footage because, by virtue of the
appraisal, they actually knew the correct square footage before they closed on
the home.  Additionally, the appellees
argued that they were not liable for any misrepresentation of the home=s square footage because they relied
on official government records for the erroneous square footage figure.  For this argument, they cited section
17.506(a)(1) of the DTPA.[2]

The trial court=s order granting summary judgment
does not specify the grounds upon which the judgment is based.

Discussion








In the Table of Contents and Issues
Presented sections of their appellate brief, the Glassmans assert, AThe Trial Court Erred in granting the
motion for summary judgment on plaintiff=s cause of action under the Texas
Deceptive Trade Practices Act because Plaintiff provided summary judgment
evidence on each and every element of cause of action and defense identified by
defendant in its motion [sic].@  In the Arguments and
Authorities section of the brief, the Glassmans restate their complaint as
follows:  AThe Trial Court Erred in Granting
Motion for Summary Judgment under Texas Rule of Civil Procedure 166a(i) >no evidence motion= because appellant proved every
element required of its causes of action and every defense raised by appellee
[sic].@

The issue on appeal as stated in the
Arguments and Authorities section is broad enough to allow argument on every
ground upon which the summary judgment could have been based.  See Malooly Bros., Inc. v. Napier, 461
S.W.2d 119, 121 (Tex. 1970); Taub v. Houston Pipeline Co., 75 S.W.3d
606, 615 (Tex. App.--Texarkana 2002, pet. denied).  In the body of the brief, however, the
Glassmans only argue that the trial court erred in granting summary judgment
based on the Aas is@ provisions.

The appellees= summary judgment motion cites
section 15F of the TRELA as an independent basis for summary judgment on all of
the Glassmans= claims except breach of contract.[3]  Yet the Glassmans= appellate brief does not address
section 15F of the TRELA.








To obtain a reversal, an appellant
must specifically attack each basis for summary judgment.  Bailey v. Gulf States Utils. Co., 27
S.W.3d 713, 716-17 (Tex. App.--Beaumont 2000, pet. denied); Timothy Patton, Summary Judgments in Texas,
Practice, Procedure and Review ' 8.03[1] (2003).  Because the Glassmans have not attacked every
basis upon which the summary judgment could have been granted, we will affirm
the summary judgment.  See Janis
v. Melvin Simon Assocs., Inc., 2 S.W.3d 647, 649-50 (Tex. App.--Corpus
Christi 1999, pet. denied); Bailey, 27 S.W.3d at 716-17; Maranatha
Temple Inc. v. Enterprise Prods. Co., 893 S.W.2d 92, 105-06 (Tex.
App.--Houston [1st Dist.] 1994, writ denied); Martin v. Cohen, 804
S.W.2d 201, 202 (Tex. App.--Houston [14th Dist.] 1991, no writ); A.C.
Collins Ford, Inc. v. Ford Motor Co., 807 S.W.2d 755, 760 (Tex. App.--El
Paso 1990, writ denied); see also Patillo v. Tarin, No. 08-01-00091-CV,
2002 WL 1988172, at *3 (Tex. App.--El Paso Aug. 29, 2002, pet. denied) (not
designated for publication).

Conclusion

Accordingly, the Glassmans= issue on appeal is overruled, and
the summary judgment is affirmed.

 

SUSAN
LARSEN, Justice

December 18, 2003

 

Before Panel No. 3

Barajas, C.J., Larsen, and
Chew, JJ.

 











[1]This
statute was replaced by section 1101.805 of the Texas Occupations Code,
effective June 1, 2003.  The language of
the statute is:  AA
license holder is not liable for a misrepresentation or a concealment of a
material fact made by a party to a real estate transaction unless the license
holder . . .  knew of the falsity of the
misrepresentation or concealment []and failed to disclose the license holder=s knowledge of the falsity of the
misrepresentation or concealment.@  Tex.
Occ. Code Ann. '
1101.805(e) (Vernon Supp. 2004).  This
provision prevails over common law and any other law.  Id. '
1101.805(b).





[2]The
language of this statute is:

 

[I]t is a defense to the award of any
damages or attorneys=
fees if the defendant proves that before consummation of the transaction he
gave reasonable and timely written notice to the plaintiff of the defendant=s reliance on:

 

(1) written information relating to
the particular goods or service in question obtained from official government
records if the written information was false or inaccurate and the defendant
did not know and could not reasonably have known of the falsity or inaccuracy
of the information . . . .

 

Tex. Bus. & Com. Code Ann. '
17.506(a)(1) (Vernon 2002).





[3]In
oral argument, the Glassmans acknowledge they have abandoned their breach of
contract claim.  The Glassmans= appellate brief does not even mention
breach of contract.