**J. William BENNETT, Appellant,**

v.

**COMPUTER ASSOCIATES INTERNATIONAL, INC., CA Management, Inc., and Joseph Veazey and Warren Giles, Appellees.**

No. 07–95–0043–CV.

Court of Appeals of Texas, Amarillo.

Aug. 20, 1996.

Rehearing Overruled Oct. 4, 1996.

Carr, Fouts, Hunt & Wolfe, L.L.P., Charles R. Watson, Amarillo, Holman, Hogan, Dubose & Townsend, Richard P. Hogan, Jr., Houston, for appellant.

Jackson & Walker, L.L.P., Charles L. Babcock, Houston, Jack Pew, Jr., Dallas, Law Office of Lee Hamel, Lee Hamel, Houston, for appellees.

Before DODSON, BOYD and QUINN, JJ.

QUINN, Justice.

J. William Bennett (Bennett) appeals from a final summary judgment entered in favor of Computer Associates International, Inc., CA Management, Inc., and Joseph Veazey (collectively referred to as CAI).[1] Through his two points of error, he asks whether the trial court erred in granting CAI's motion for summary judgment, and in denying his own, upon his claims of defamation and tortious interference with contract. We affirm in part and reverse in part.[2]

### Background

Bennett sued CAI for defamation, false light, invasion of privacy, intentional infliction of emotional distress, and tortious interference with contract. The allegations arose from the sale of the assets of J. William Bennett Company (Bennett Co.) to Goal Systems International, Inc. (Goal). The assets sold consisted of most everything that Bennett Co. owned, including five computer programs allegedly developed by Bennett and known as Jobtrac, Runtrac, Libtrac, Reptrac, and Logtrac (collectively referred to as the "Software Products"). In return, Goal agreed to give Bennett, among other things, $1,000,000, "the present value of [Bennett Co.'s] ... accounts receivable (subject to adjustment ...)," a percentage of the "license revenue" earned during a specified period, and options to purchase Goal common stock.[3] The number of options transferred depended upon the amount of "license revenue" generated by the licensing of the Software Products.

Bennett also executed a written agreement with Goal under which the latter agreed to employ him for approximately four and one-half years. Additionally, his compensation would consist of, among other things, a salary plus yearly bonus.

After Bennett Co. and Goal closed their transaction, CA Management, Inc. sued Goal for copyright infringement in the United States District Court for the Southern District of Texas. It alleged that of the five items comprising the Software Products, two, that is, Jobtrac and Runtrac, contained pro-

---

1. Bennett moved for leave to dismiss Veazey from this appeal. The motion was granted. Thus, Veazey is no longer an appellee.

2. Among the various causes of action alleged in Bennett's live pleading and encompassed by the final summary judgment were those involving false light, invasion of privacy, and the intentional infliction of emotional distress. However, they go unmentioned in his appellate brief. Thus, he waived any complaint which he may have had regarding their viability. *A.C. Collins Ford, Inc. v. Ford Motor Co.*, 807 S.W.2d 755, 760 (Tex.App.—El Paso 1990, writ denied).

3. The asset purchase agreement was originally between Bennett Co. and Goal. However, Bennett Co. assigned its rights under same to Bennett, with the approval of Goal. Thus, the consideration due Bennett Co. under the contract was actually payable to Bennett.

prietary information it created or owned. Bennett supposedly incorporated the proprietary matter into the two programs without approval, according to the federal pleading. Eventually, CA Management settled its dispute with Goal for 3.5 million dollars, and, in turn, Goal fired Bennett and refused to further perform its obligations under the asset purchase agreement.

Believing himself aggrieved, Bennett sued CAI in the 129th Judicial District Court of Harris County. After issue was joined, the parties filed cross-motions for summary judgment. The court granted that of CAI, denied Bennett all relief, and entered an order specifying the basis for its decision. Bennett then appealed, and the matter lies before us.

Again, Bennett's appellate brief addressed only two of the causes of action rejected by the trial court. Because of that, we consider only the reasons stated in the trial court's order as applicable to those two claims. As to the matter of defamation, the court held that the supposedly disparaging remarks were either absolutely privileged, conditionally privileged, not defamatory, substantially or literally true, unpublished by CAI save for a few exceptions, or opinion. Concerning the issue of tortious interference, it determined that Bennett lacked standing to complain, that CAI's actions were privileged, and that judgment was appropriate "for the same reasons ... summary judgment ha[d] been granted with respect to ... [the] cause of action for defamation."

### Point of Error—Defamation

Bennett contends that the trial court erred in granting CAI's motion for summary judgment and in denying his motion for partial summary judgment on defamation. We disagree and overrule the point. Before explaining why, however, we must first consider a procedural matter.

### I.  Scope of Review

■ CAI's motion for summary judgment addressed approximately twelve different situations in which comments were made. Four concerned press or newswire releases, four involved articles in a magazine entitled

*Computerworld*, three encompassed internal memoranda circulated to CAI employees, and one pertained to settlement discussions between CAI and Goal on July 5, 1990, concerning the federal suit. Nevertheless, Bennett argued, on appeal, that "[h]is ... claim was based on [CAI's] various publications that he was a 'thief' and a 'crook' who had stolen ... computer software." These particular utterances were allegedly made by Anthony (Tony) Wang, then president of Computer Associates International, during the July 5th settlement discussions.

Bennett said nothing in his brief about the trial court's action *vis-a-vis* the remarks allegedly appearing in the newspapers, trade magazines, or internal memoranda to company employees. From this, we conclude that he waived complaint about the propriety of the summary judgment upon all the supposed defamations save those made during the July 5th settlement conference. *See A.C. Collins Ford, Inc. v. Ford Motor Co.*, 807 S.W.2d 755, 760 (Tex.App.—El Paso 1990, writ denied) (holding that the failure to address, in its appellate brief, claims asserted below effected a waiver of the unmentioned claims). With this in mind, we now address the merits underlying Bennett's point of error.

### II.  Privileged Communication

■ One who falsely imputes to another the crime of theft commits slander *per se*. *Glenn v. Gidel*, 496 S.W.2d 692, 697–98 (Tex. Civ.App.—Amarillo 1973, no writ); *see Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 334 (Tex.App.—Dallas 1986, no writ) (holding that a statement which unambiguously and falsely imputes criminal conduct to another is slander *per se* ). Furthermore, the slander is actionable if uttered to a third-party without legal excuse or privilege. *Glenn v. Gidel*, 496 S.W.2d at 698.

Falsely calling someone a "crook" or "thief" or falsely accusing him of stealing property falls within the parameters of slander *per se*, as discussed above. Thus, the purported statements of Wang were actionable unless otherwise excused. CAI attempted to cloak them with excuse by con-

tending that they arose incident to a judicial proceeding. We agree.

■ Any communication made or published during the course of a judicial proceeding is absolutely privileged; that is, no action will lie to recompense any injury which they may cause. *James v. Brown*, 637 S.W.2d 914, 916–17 (Tex.1982); *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex.1942). Furthermore, to be so privileged, the statement must "bear[ ] some relation" to proposed or existing litigation. *Hill v. Herald–Post Pub. Co.*, 877 S.W.2d 774, 782 (Tex. App.—El Paso 1994), *aff'd on this ground, rev'd on other grounds*, 891 S.W.2d 638 (Tex. 1994); *Odeneal v. Wofford*, 668 S.W.2d 819, 820 (Tex.App.—Dallas 1984, writ ref'd n.r.e.); *Russell v. Clark*, 620 S.W.2d 865, 870 (Tex. Civ.App.—Dallas 1981, writ ref'd n.r.e.). For example, comments made 1) in pretrial hearings, depositions, affidavits, pleadings, or "papers in the case," *James v. Brown*, 637 S.W.2d at 916–17, 2) in correspondence sent "in contemplation" of suit, *id.* at 917, 3) in conferences convened preliminary to suit, *Russell v. Clark*, 620 S.W.2d at 868–69, or 4) in pleadings delivered to the media, have the requisite nexus. *Hill v. Herald–Post Pub. Co.*, 877 S.W.2d 774, 782–83 (Tex.App.—El Paso 1994), *aff'd on this ground, rev'd on other grounds*, 891 S.W.2d 638 (Tex.1994).[4]

■ So to are statements contained in settlement letters sufficiently connected with a pending or potential suit to come within the privilege, according to the Oregon Supreme Court in *Chard v. Galton*, 277 Or. 109, 559 P.2d 1280 (1977).[5] There, an attorney delivered a settlement letter to another accusing someone of driving while drunk. The person to whom the attorney referred sued for defamation. While recognizing that the comment

"had no direct bearing on the actual litigation," the Oregon court, nevertheless, acknowledged that it arose in the context of settlement. *Russell v. Clark*, 620 S.W.2d at 870, *discussing, Chard v. Galton, supra.* Thus, it bore some relation to proposed litigation and, therefore, was absolutely privileged. *Id.*

We find no fault with the reasoning of *Chard.* It is a verity of life that all things human, including lawsuits, have a beginning and end.[6] These two aspects define the thing involved, and in defining it, they are inextricably related to and become a part of it. Settling a claim, or attempting to do so, is the conceptual equivalent of ending, or attempting to end, an actual or potential judicial proceeding. To that extent, it "bears some relation" to the proceeding. Furthermore, since courts have deemed conduct related to the initiation of a suit as sufficiently related and privileged, *e.g., Russell v. Clark, supra* (involving the gathering of evidence), there is no sensible reason to exclude conduct involving the termination or resolution of the same suit.

■ Given this, we too agree that remarks uttered during settlement negotiations bear enough relationship to a pending or potential suit to fall within the scope of absolute privilege. And, because it was undisputed that Wang's comments at issue were uttered during such negotiations, they were absolutely privileged. Thus, CAI was entitled to summary judgment on the matter of defamation while Bennett was not.[7]

### Point of Error—Tortious Interference with Contract

Next, Bennett argues that the trial court erred in granting CAI's motion for summary

---

4. The privilege, however, does not cover press conferences. *Hill v. Herald–Post Pub. Co.*, 877 S.W.2d 774, 782–83 (Tex.App.—El Paso 1994), *aff'd in part, rev'd in part* 891 S.W.2d 638 (Tex. 1994).

5. We are not the first Texas appellate court to discuss *Chard*. The Court of Appeals for the Fifth District addressed it, with apparent approval, while attempting to determine the scope of the privilege accompanying judicial proceedings. *Russell v. Clark*, 620 S.W.2d 865, 870 (Tex.Civ. App.—Dallas 1981, writ ref'd n.r.e.)

6. We acknowledge that with regard to some things, the beginning comes much too late and the end, much too early, and vice-versa.

7. This is not to say that such labels should be bandied about at will. Being privileged to speak is not tantamount to freedom from courtesy, manner, or professionalism. Though breach of the latter may not be actionable, they are, nevertheless, ideals deserving of honor.

judgment *vis-a-vis* his claim of tortious interference with contract. We agree in part and disagree in part.

### I. Standing

■ Of the three reasons expressed by the court for granting judgment to CAI, one entailed Bennett's standing to complain of the alleged interference. It held that he had none. Yet, the summary judgment evidence belies that decision.

After Goal and Bennett Co. consummated the purchase agreement, the latter assigned "all [its] remaining property and assets" to Bennett. This assignment included the "subsequent payments and royalties due" Bennett Co. from Goal. Furthermore, Goal approved the transfer. Thus, the record contains substantive evidence illustrating that Bennett owned the choses-in-action (property rights) created by the agreement. To that extent, CAI did not negate all material issues of fact concerning its opponent's standing to pursue the claims.

### II. Privilege

Next, the trial court determined that CAI established, as a matter of law, its affirmative defense of privilege. The record evidence belies that ruling as well.

■ One can defeat a claim of tortious interference with contract by proving that his actions were justified or privileged. *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996). This can be done by showing that he acted to further or protect his own legal rights which were equal or superior to those of his opponent. *Id.* at 211; *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 107 (Tex.1984). Or, he may prove that he acted, in good faith, to further or protect a colorable legal right, even though the claim ultimately proves to be mistaken. *Texas Beef Cattle Co. v. Green,* 921 S.W.2d at 211; *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991) (noting this to be the rule). Here, CAI invoked the second means of establishing justification. Thus, we focus on it and its parameters.

■ First, we note that the court in *Texas Beef Cattle* left the term "colorable right" undefined. Nevertheless, it has been construed, in other settings, as "an appearance of right" which would lead others, "without inquiry, to suppose" the existence of the right claimed. *Cox v. Houston & T.C.R. Co.,* 68 Tex. 226, 4 S.W. 455, 457 (1887) (involving a colorable right to public office). This interpretation comports with the definitions given the word "colorable" in the sixth edition of *Black's Law Dictionary* and in *Webster's Third New International Dictionary.* According to the former, it means "having the appearance of truth," while in the latter, it means "seemingly valid and genuine [or] having an appearance of truth, right, or justice...." Thus, we conclude, that a right is colorable if it appears, without further inquiry (that is, if it appears on its face), genuine, truthful, valid, or existing.

However, the definition of "good faith" is not so easily discernable. We know that in some situations it carries indicia of reasonableness, that is, what one knew or reasonably should have known given the circumstances. In others, it simply connotes "honesty in fact" sans questions of reasonableness. *E.g., Tex. Bus. & Com.Code Ann.* § 1.201(19) (Vernon 1994); *Riley v. First State Bank,* 469 S.W.2d 812, 816 (Tex.Civ. App.—Amarillo 1971, writ ref'd n.r.e.). *Texas Beef Cattle Co.* fails to tell us which is applicable to claims of tortious interference. *Texas Beef Cattle Co. v. Green,* 921 S.W.2d at 216 (dissent) (noting that the question of how to define good faith "remains open").

Moreover, a close reading of the case suggests that one's personal motivation is not relevant. For instance, the Supreme Court stated in *Texas Beef Cattle Co.,* that "[i]mproper motives cannot transform lawful actions into actionable torts." *Id.* at 211. Whatever one had a legal right to do, he may do with impunity regardless of any bad motive which may have influenced his conduct, according to the court. *Id.* Having said this, it then held that once a defendant is found to have asserted a colorable claim in good faith his "actual malice became immaterial." *Id.* To make sense of the opinion, it must be read as holding that actual malice is irrelevant to good faith. Thus, the Supreme

Court effectively eviscerated motive from good faith and left the concept to mean something akin to " 'having [an objectively] well grounded and justifiable belief of a right.' " *Id., quoting, Sakowitz, Inc. v. Steck, supra.*

### A. Application of Test

#### 1. Colorable Right

##### a. CA Management

■ CA Management obtained a "certificate of registration," or copyright covering data purportedly copied into Runtrac and Jobtrac. Obtaining the certificate had a twofold effect. It not only gave the company standing to "institute an action for any infringement," 17 U.S.C. § 501(b), but also constituted "prima facie evidence of the validity of . . . [its] copyright" in *"any"* judicial proceeding." 17 U.S.C. 410(c) (emphasis added); *Norma Ribbon & Trimming, Inc. v. Little,* 51 F.3d 45, 47 (5th Cir.1995); *accord Lakedreams v. Taylor,* 932 F.2d 1103, 1108 n. 10 (5th Cir.1991) (noting that the certificate creates a rebuttable presumption regarding the validity of the copyright). To the extent that the certificate constituted, as a matter of law, "prima facie evidence" of CA Management's copyright in the data made subject of the copyright, it certainly constituted, as a matter of law, sufficient evidence to clothe CA Management with an "appearance of right" or colorable right to that very same data.[8]

Yet, as previously alluded to, only Runtrac and Jobtrac were supposedly tainted with CA Management's proprietary information. Neither it, nor Computer Associates contended or presented evidence illustrating that the Libtrac, Reptrac, and Logtrac programs contained the protected data. Nor did CAI argue or prove that any of the other property itemized in the asset agreement infringed upon its property rights. Given this, CA Management, at most, could interfere only with Bennett's right to receive payment for Runtrac and Jobtrac, assuming it could even prevent that. In other words, the record fails to illustrate that, as a matter of law, CA Management's colorable right extended to the *entire* asset purchase agreement.

Similarly, to the extent that CA Management could interfere with Bennett's employment agreement, it's privilege to do so was restricted. That is, Goal hired Bennett "to direct research and development efforts of [Goal] . . . in connection with the 'Jobtrac', 'Runtrac', 'Libtrac', 'Reptrac', and 'Logtrac' computer software products." Furthermore, only the development of two of the five programs allegedly infringed upon CA Management's copyright. Thus, and assuming that the force of the copyright empowered CA Management to halt further development of those two programs, its privilege did not extend to the development of the other three since no one alleged that they contained protected data.

##### b. Computer Associates

■ Computer Associates also founded its claim of privilege upon the copyright. Yet, the latter names "CA Management, Inc." as the sole "claimant" or owner. Furthermore, CA Management is named as the only plaintiff in the federal action. Indeed, CA Management expressly averred in the federal proceeding that it, or its predecessor-in-interest (an entity other than Computer Associates International), was "the sole owner of all right, title and interest" to the program code allegedly copied by Bennett. From this, one could reasonably infer that CA Management alone had a proprietary interest in the copyrighted data.[9] This, in turn, illustrates that CAI failed to negate all

---

8. That Bennett may later rebut the presumption created by the copyright is unimportant. Again, the claim need not be ultimately successful to be colorable. *See Texas Beef Cattle Co. v. Green, supra* (stating that the privilege exists "even though [the claim] ultimately proves mistaken" if otherwise asserted in good faith). Furthermore, we disagree with Bennett's suggestion that to win summary judgment, CA Management had to "establish, as a matter of law, with no contrary evidence, that its rights were conclusively superior or equal to Bennett's rights in all of the assets." As previously noted, CAI urged the second avenue of the justification defense. Thus, it had to only show a colorable, not unassailable, right. *Sakowitz, Inc. v. Steck,* 669 S.W.2d at 107.

9. In an appeal from a summary judgment, the evidence, and all reasonable inferences made therefrom, must be construed in a manner most favorable to the party opposing the summary judgment motion.

material issues of fact regarding Computer Associates' ownership interest and colorable rights, if any, in the protected code.

For like reason, CAI failed to negate all material issues of fact regarding Computer Associates' colorable claim *vis-a-vis* the employment contract. If the company did not own the copyright, it could not use that copyright as basis for preventing the development of any program.

## 2. Good Faith

### a. CA Management

■ As to the matter of good faith, we must remember that it inherently involves a question of fact. *Buck v. Century 21 Beezley Real Estate, Inc.*, 907 S.W.2d 660, 664 (Tex. App.—Eastland 1995, no writ); *Modular Tech. Corp. v. City of Lubbock*, 529 S.W.2d 273, 276 (Tex.Civ.App.—Amarillo 1975, writ ref'd n.r.e.). Though CAI proffered affidavit testimony supporting the bona fides of its conduct, that was not the only evidence touching upon the subject. For example, and as developed above, the supposedly tortious actions of CAI embraced contracts and payment for computer programs in which it had no, and never claimed, a right, colorable or otherwise. Other summary judgment evidence illustrated that CAI desired to be placed in the "shoes" of Bennett *vis-a-vis* his asset purchase agreement with Goal and that the amounts demanded encompassed approximately all the monies Bennett would receive under the agreement regardless of source. From this, one could reasonably infer that both CA Management and Computer Associates acted indiscriminately and interfered with contracts or portions thereof in which neither had a "well grounded and justifiable belief of right." [10] Consequently, CAI failed to negate all material issues of fact regarding its good faith.

### III. Defamation

■ The court also granted CAI relief "for the reasons that summary judgment has been granted with respect to plaintiff's cause of action for defamation." Bennett disputes the legitimacy of this rationale and asserts that it goes "without saying that defenses to defamation are not defenses to other, independent theories of recovery asserted in the same lawsuit." Thus, by defeating claims of defamation, in his view, one does not automatically defeat a claim of tortious interference.

Conceptually, Bennett would appear correct. Tortious interference with contract and defamation are two distinct causes of action. The former exists to remedy improper acts of interference with the enjoyment of one's rights under existing contracts. The latter involves ameliorating injury to one's name and reputation caused by untrue and disparaging words. *See Fitzjarrald v. Panhandle Pub. Co.*, 228 S.W.2d 499, 503 (Tex. 1950) (stating that law of libel and slander "protects the right of a citizen to defend his reputation and good name from libelous publications"). Since the rights, interests, and conduct entailed in each differ, it would seem rather illogical to conclude that the inability to recover under one theory automatically prohibits recovery under the other.

Yet, there are situations wherein the defenses applicable to defamation have been utilized to bar recovery under theories other than defamation. For instance, in *Bird v. W.C.W.*, 868 S.W.2d 767 (Tex.1994), the defense of privilege was used, to defend against a claim of negligence. Furthermore, in *Martinez v. Hardy*, 864 S.W.2d 767 (Tex.App.—Houston [14th Dist.] 1993, no writ), the court held that the defense of absolute privilege barred the plaintiff from recovering damages under the theory of tortious interference. *Id.* at 775–76. This was so because "[t]he gravamen of Martinez' tortious interference claim [was] the allegedly defamatory statements" made by one defendant to another. *Id.* at 776.

At bar, Bennett alleged that defamatory statements uttered by CAI caused him to lose his contracts with Goal. Nevertheless, the record contains evidence from which one could reasonably infer that CAI undertook

---

10. We need not rely on whether the evidence indicating that Wang wanted Bennett to "burn" also evinces something less than good faith.

Such comments may evince ill will or malice but neither is relevant, according to *Texas Beef Cattle Co.*

purportedly tortious conduct involving other than disparaging or false words. Demanding to be placed "in the shoes of" Bennett, that is, be given everything to which he is entitled regardless of its source, is one such example. The statement represents a position or stance, not a false remark. Given that, defenses applicable to defamation would have no bearing, and the trial court erred in indiscriminately applying them to bar all aspects of Bennett's chose-in-action for tortious interference.

### IV. Causation

Among the other grounds asserted by CAI in support of summary judgment was that concerning causation. It contended that nothing it did caused Goal to fire Bennett. Furthermore, the affidavit of David Wetmore, Goal's then president, was tendered in support of the position.

Wetmore attested that Bennett was initially suspended "because ... [he] admitted copying code" of CAI. However, he was not fired until Goal compared its Runtrac and Jobtrac programs with the data CAI considered proprietary. According to Wetmore, the comparison revealed that "code in the product ... acquired from [Bennett Co.] included code that appeared to be copied from" CAI's programs. After talking to Bennett and making the comparison, Goal terminated him, and, according to Wetmore, the decision to do so was neither "discussed with nor instigated by anyone from" CAI.

█ The trial court did not act upon this evidence. That is, causation was not cited in its final judgment as reason for denying Bennett recovery pursuant to his claim of tortious interference. Historically, this would preclude us from reviewing anything other than the grounds expressed in its order. However, such is not the case anymore. In *Insurance Co. v. Cates,* 927 S.W.2d 623 (1996), the Texas Supreme Court held that we may not only consider those grounds upon which the trial court expressly acted but also any others which the movant preserved for appeal. *Id.*

█ Here, CAI not only raised the issue of causation below but developed it in its brief after generally asserting that the trial court did not err. Consequently, it adequately preserved the ground for review. *See Bruckner Truck Sales, Inc. v. Farm Credit Leasing Serv. Corp.,* 909 S.W.2d 75, 78 (Tex.App.—Amarillo 1995, no writ) (stating that Rule 74(p) of the Texas Rules of Appellate Procedure "obligates us to observe not only the wording of the points of error but the argument under each point to determine the intent of the party" concerning the scope of the point); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982) (stating the same). Furthermore, Wetmore's sworn statements as to why Goal terminated Bennett were clear, direct, positive, and uncontradicted. They negated all material questions of fact regarding the proximate cause of Bennett's discharge, and established, as a matter of law, that Goal acted unilaterally upon information garnered through its own investigation.

Accordingly, that part of the final summary judgment declaring that Bennett take nothing as to his claims for defamation, false light, and intentional infliction of emotional distress are affirmed. That portion of the final summary judgment declaring that he take nothing as to his claim for tortious interference with his employment contract is affirmed. That portion of the final summary judgment declaring that he take nothing as to his claim for tortious interference with the asset purchase contract is reversed and remanded for further proceedings.

### On Motion for Rehearing

█ J. William Bennett moved for rehearing as did Computer Associates International, Inc. and CA Management, Inc. Having considered the grounds alleged in each motion, we find it necessary to address two uttered by Bennett. The first concerns the justification to interfere with contractual rights and the second, waiver of argument.

As to the former, Bennett excepts to "this court's leap to the conclusion that 'motive' now has no place in good faith." Furthermore, "[t]he reason for the intentional interference has not lost its place in the justification privilege defense to a tortious interference cause of action." We disagree,

given recent Supreme Court pronouncements involving torts implicating concepts of good faith, bad faith, and bona fide dispute.

For instance, in addressing the matter of bad faith in a suit against an insurer, the Supreme Court held that "as long as the insurer has *a reasonable basis* to deny or delay payment of the claim, even if that basis is eventually determined by the factfinder to be erroneous, the insurer is not liable for the tort of bad faith." *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 600 (Tex.1993) (emphasis added). It continued by stating that the "issue of bad faith focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct." *Id.* at 601 (emphasis added). So, despite the fact that the insurer in *Lyons* ignored its own adjuster's advice to pay the claim, it was not liable for the tort of bad faith since no evidence indicated that

the reports of Millers' experts were not objectively prepared, or that Millers' reliance on them was unreasonable, or any other evidence from which a factfinder could infer that Millers acted without a reasonable basis and that it knew or should have known that it lacked a reasonable basis for its actions.

*Id.*

A year later, in *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex.1994), the Court not only reconfirmed *Lyons* but also endeavored to explain the role of motive. It stated that "[e]vidence ... merely show[ing] a *bona fide dispute* about the insurer's liability on the contract ... [did] not rise to the level of bad faith." *Id.* at 17 (emphasis added). Nor was bad faith established by evidence illustrating that "the insurer was merely incorrect about the factual basis for its denial of the claim, or about the proper construction of the policy." *Id.* at 18. Instead, one had to prove that "the insurer had no reasonable basis for denying or delaying payment ... and that it knew or should have known that fact." *Id.* Having said this, it turned to the concept of the actor's mental state or motive, or, as Bennett claims here, evil mind bent on consciously injuring others. The latter, ac-

cording to the Court, was not elemental to the tort itself but to the damages recoverable as a result of the tort. Without it, the complainant could receive nothing more than compensatory damages; with it, he could possibly recover exemplary damages. *Id.* at 18–19 (stating that "[o]nly when accompanied by malicious, intentional, fraudulent, or grossly negligent conduct does bad faith justify punitive damages").

Two years later, the Supreme Court issued *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex.1996). Though not dealing with bad faith activities of an insurance company, *Texas Beef Cattle* nevertheless fit within the mold of *Lyons* and *Moriel.* It too concerned liability for a tort wherein a bona fide dispute or good faith action was elemental to the tort itself.[1] Furthermore, like in *Moriel,* the Court sought to explain the role that proof of an evil mind plays in a suit. And, again, it limited the relevance of evil motive to the question of damages. *Id.* at 210. Moreover, to assure that others realized this, it reiterated prior law declaring that justification was founded upon the exercise of an indisputable right or a bona fide claim to a colorable right and pronounced, in rather stark language, that

*[i]mproper motives* cannot transform lawful actions into actionable torts. "Whatever a man has a legal right to do, he may do with impunity, *regardless of motive,* and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a *bad motive* in exercising the right."

*Id.* at 211, *quoting Montgomery v. Phillips Petroleum Co.,* 49 S.W.2d 967 (Tex.Civ. App.—Amarillo 1932, writ ref'd) (emphasis added). If nothing else, the quotation illustrates that motivation is not an element of the tort itself or of justification. All is dependent upon whether the defendant acted upon an indisputable claim or, to borrow from *Lyons* and *Moriel,* a reasonably based claim to a colorable right. If so, then no liability attaches regardless of whether the defendant had an evil motive in acting. Again, the latter is relevant only to damages

---

1. Indeed, justification was originally defined as involving a "bona fide" claim or dispute. *See*   *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 107 (Tex.1984).

once justification is negated; it does not negate justification.

Finally, we turn to the allegation that we should have addressed those aspects of the defamation chose which Bennett failed to brief. It fell to the appellant to develop the issues it wants the court to entertain. An appellee may brief the moon, but if the appellant's contentions are earth bound, we need not travel any farther.

Accordingly, the motions for rehearing are overruled.