# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00665-CV

**William "Bill" Moriarty; Moriarty & Associates, LLC; Diane Hyatt; and Diane Hyatt & Associates, LLC, Appellants**

**v.**

**Malcolm Pirnie, Inc.; Parsons Engineering Science, Inc.; James Clinton Walker; Lynn Mays; Greg Wieland; and Bruce Todd, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. D-1-GN-08-003745, HONORABLE GISELA D. TRIANA-DOYAL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In 2005, appellees or their representatives met with the City of Austin's city manager to present allegations of financial improprieties by appellant William Moriarty, the project manager of the Austin Clean Water Program ("ACWP") at the time. The city manager, while investigating appellees' allegations, confirmed that Moriarty was in a romantic and financial relationship with Diane Hyatt, whose company had received multiple contracts in connection with the ACWP. The city manager then requested that Moriarty be removed from the ACWP on the basis that Moriarty's relationship with Hyatt created a conflict of interest. As a result, Moriarty was removed from the project, and appellants—Moriarty, Hyatt, and their respective companies—alleged that they have incurred damages as a result.

Appellants filed suit against appellees, asserting claims for tortious interference with existing contracts and prospective business relations. The district court granted appellees' motions for summary judgment and rendered a take nothing judgment on the tortious interference claims. On appeal, appellants argue that they produced enough evidence to raise a genuine issue of material fact on the question of whether appellees' actions were a substantial factor in the city manager's decision to request Moriarty's removal from the ACWP. We affirm the judgment of the district court.

*Factual and Procedural Background*

The ACWP was a program under which the City of Austin sought to plan, design, and construct certain wastewater facilities to comply with an administrative order of the federal Environmental Protection Agency. In 2001, the City of Austin entered into a contract with Earth Tech, Inc. for the provision of program management consultant services related to the ACWP. Earth Tech, in turn, contracted with the engineering firm Moriarty & Associates, LLC, by which William Moriarty was to act as the program manager with respect to the ACWP.

In April 2005, representatives from six engineering firms with operations in the City twice met to discuss concerns they had regarding Moriarty's management of the ACWP. As a result of these two meetings, three lobbyists representing the firms met with Toby Futrell, the city manager, and Joe Canales, the deputy city manager, in June 2005. The primary allegation made at the June 2005 meeting was that Moriarty had been improperly steering ACWP-related subcontracts in accordance with his own personal interests rather than in the interests of the City.

Following the meeting, Futrell initiated investigations into the allegations against Moriarty. These investigations were conducted by the Office of the City Auditor (OCA) and by outside counsel Connie Cornell.

In both investigations, the allegations that Moriarty improperly steered contracts to particular contractors were generally found to be unsubstantiated.[1] However, both investigations determined that Moriarty—while project manager—had entered into a romantic and financial relationship with Diane Hyatt, owner of Diane Hyatt & Associates, LLC ("DHA"). Moriarty and Hyatt admitted to a romantic relationship since May 2004.[2] On July 20, 2004, they had signed a co-tenancy agreement and a deed for a house, where they were living together by October 2004. Moriarty and Hyatt also admitted that, during the time period in which they were in a romantic relationship and cohabiting, Moriarty was the ACWP program manager and DHA was selected for ACWP work (DHA received its first ACWP contract in May 2004). An analysis of all ACWP rotation lists led to a finding that DHA ranked twentieth out of the ninety-two consultants that had received payments, whether as a prime or sub-consultant, and it was calculated that ACWP contracts were the source of approximately 75 percent of DHA's income. The nature of the relationship between Moriarty and Hyatt had not been disclosed to the City.

---

[1] Representatives of the six engineering firms had also reported some of their suspicions to the Austin Police Department in November 2004 and again in April 2005. According to the department's notes, both cases were determined to be "unfounded."

[2] Moriarty and Hyatt testified that their first date was in May 2004, and that they took a "recreational" trip together to Las Vegas on the last weekend of that month. Moriarty admitted that Hyatt arrived with him at a March 17, 2004 party thrown by the mayor, although he insisted they were there only as professional colleagues. Moriarty also admitted that, regarding the weekend in Vegas, he had purchased the airplane tickets in March 2004 based on his "hoping to make it a little bit of a surprise trip for Diane" and "hoping that in the future we would get together."

While it was not clear whether Moriarty was contractually or legally required to disclose the relationship, or the extent to which Moriarty was responsible for DHA's receiving the subcontracts in question, Futrell and Canales met with Phillip Watts, Earth Tech's vice president, on November 3, 2005, to request that Moriarty's involvement in the ACWP come to an end. On November 10, 2005, Watts informed Moriarty by letter that his involvement in the ACWP would be terminated and that Earth Tech was amenable to a "mutually agreed upon voluntary termination of the Subcontract."

Appellants Moriarty, Hyatt, and their respective companies originally filed suit on July 31, 2006, and subsequently added appellees as defendants in the lawsuit. Appellees Malcolm Pirnie, Inc. and Parsons Engineering Science, Inc. are two of the six engineering firms from which the original allegations against Moriarty originated, and appellees James Clinton Walker, Lynn Mays, Greg Wieland, and Bruce Todd are representatives of those firms (Todd is also one of the three representatives who met with Futrell in June 2005). In their lawsuit, appellants allege that appellees tortiously interfered with appellants' contracts or prospective business relations.

Appellees filed motions for summary judgment. On July 16 and 18, 2008, the district court granted appellees' motions for summary judgment[3] and rendered take nothing

---

[3] The district court also rendered summary judgment in favor of two other defendants on June 25, 2008, and in favor of the two remaining defendants on September 10, 2008. These defendants have since settled with appellants and are not parties to this appeal. All four motions for summary judgment by the various defendants were based on the same grounds.

judgments on appellants' tortious interference claims.[4] Appellants appeal the district court's judgments.

*Analysis*

Appellants present four issues on appeal:[5] (1) the district court erred by granting appellees' "traditional" motion for summary judgment on the issue of proximate cause; (2) the district court erred by granting appellees' "no evidence" motion for summary judgment on the issue of proximate cause; (3) the district court erred by granting appellees' "no evidence" motion for summary judgment on the issue of damages; and (4) the district court erred in striking portions of appellants' summary judgment evidence. Because we hold that, even taking into account the evidence at issue in appellants' fourth point on appeal, summary judgment was proper based on the lack of a genuine issue of material fact as to the issue of proximate cause, we need only address appellants' first issue on appeal.[6]

---

[4] The district court rendered the take nothing judgments with respect to all claims asserted in appellants' third amended petition, which is at issue in this appeal. According to the docket sheet, appellants filed a fourth amended petition on July 16, 2008. In its July 16, 2008 order, the district court stated that the order "does not affect other different claims, if any, brought against Parsons Engineering Science, Inc. and Wieland in Plaintiffs' Fourth Amended (or subsequent) Petition(s)." The fourth amended petition is not in the appellate record.

[5] Appellants originally asserted six issues on appeal. In their reply brief and at oral argument, they withdrew two of the issues.

[6] When the trial court does not specify the basis for its summary judgment, the appealing party must show error on each ground asserted in the motion. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). We must affirm the summary judgment if any one of the grounds presented to the district court is meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

We review summary judgments de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). The standards for reviewing a "traditional" rule 166a(c) motion for summary judgment are well established: (1) the movants must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law; (2) in deciding whether a disputed issue of material fact exists that would preclude summary judgment, we take all evidence favorable to the non-movants as true; and (3) we indulge every reasonable inference and resolve any doubts in favor of the non-movants. *See* Tex. R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

Appellees' motions for summary judgment attack the "proximate cause" element of appellants' tortious interference claims. *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) (elements of cause of action for tortious interference with contract). Proximate cause in the context of a tortious interference claim involves both cause-in-fact and foreseeability. *See Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). To constitute proximate cause, the defendants' acts or omissions must have been a "substantial factor" in bringing about the injury. *See Nixon*, 690 S.W.2d at 549; *Richardson-Eagle*, 213 S.W.3d at 474. Proximate cause can be a question of law when the evidence is without material dispute and where only one reasonable inference may be drawn from the evidence. *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 266 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Proximate cause cannot be satisfied by mere conjecture, guess, or speculation. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008).

6

Appellants' tortious interference claims rest on Futrell's request to Earth Tech that Moriarty be removed as program manager of the ACWP. Therefore, to prevail on appeal, appellants must demonstrate that there is a genuine issue of material fact with respect to whether appellees' actions were a substantial factor in Futrell's decision to request Moriarty's removal from the ACWP. *See Powell Indus.*, 985 S.W.2d at 456 ("A defendant may defeat a tortious interference claim on summary judgment by disproving one element of the claim as a matter of law.").

Futrell testified without contradiction that the reason she requested Moriarty's removal from the ACWP was his relationship with Hyatt.[7]

> It's because in the 11 months after an acknowledged—relationship acknowledged in the investigation, over a million—almost a million two dollars of authorizations of contracts were either added or extended in a program through eight different contracts with a woman that he acknowledged having a relationship with. That's a problem.
>
> . . . .
>
> He was stepping into the City's shoes to manage our project, and we didn't see that he could manage primes when they were having as their sub the person that he lived with and was buying a house with. That could potentially impact his decision-making. . . .
>
> . . . .
>
> This was a contract that gave us the ability to ask for a different project manager, and that's all we did. We asked for a change in a project manager so that we didn't have that conflict in place. It wasn't a performance issue. It was to resolve that conflict.
>
> . . . .

---

[7] Appellants concede that Futrell is not an "interested witness." *See* Tex. R. Civ. P. 166a(c); *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990).

The removal of Bill Moriarty from the project—my asking for a different project manager was based on the results of the investigation. Allegations come and go in organizations sometimes substantiated, sometimes not. The decision was based on the results of the investigation, not the allegations themselves.

. . . .

Outside of the fact that [the meeting with the firms' representatives] brought to my attention concerns, it did not play into the decision-making.

Futrell specifically stated that neither the six engineering firms nor their representatives played a substantial factor in her decision-making.

There is no evidence in the record that contradicts or controverts Futrell's testimony. According to a November 7, 2005 memo from David Allan Smith (the city attorney) to the mayor and city council regarding the investigations, three allegations were "verified," all of which concerned Moriarty's relationship with Hyatt or DHA. In a memo sent internally within Earth Tech on November 4, 2005, Watts stated that the requests for Moriarty's removal were based on a "common theme" from the investigation that there was a "perceived conflict of interest due to Earth Tech's subcontracting to Diane Hyatt and Associates" and the "acknowledged personal relationship."

Appellants contend that Futrell first learned of Moriarty and Hyatt's relationship at the June 2005 meeting with appellees or their representatives and, therefore, that appellees are responsible for Futrell's requesting Moriarty's removal. Even if appellants are correct with respect to the June 2005 meeting,[8] Futrell did not act on the allegation of an existing relationship

---

[8] We note that while there is some evidence (in documents struck by the district court and subject to appellants' final point on appeal) that the existence of a relationship between Moriarty and Hyatt was raised in the June 2005 meeting, there is no evidence that at that time Futrell was aware

until after it was confirmed by the investigations. According to the preliminary results of the OCA's investigation, issued on August 19, 2005, Moriarty and Hyatt shared a utility account and phone number at a residence, and the recommendation was made that if a conflict of interest "in fact or appearance" were confirmed, "the City should take the necessary steps to rectify the situation, which could include removing one or more of the parties from the ACWP." The OCA's November 3, 2005 "summary of analysis" found the personal relationship to be substantiated, although whether an actual conflict existed was not determined. Similarly, the October 11, 2005 investigation report provided to Futrell by Cornell, the City's outside counsel, included admissions by both Moriarty and Hyatt that they were romantically involved and cohabiting. The City Auditor's Integrity Unit made an investigative finding that "Moriarty was involved in a personal and financial relationship with an ACWP subcontractor."[9]

---

of the extent of that relationship, the extent to which Hyatt or DHA had been awarded contracts during the relationship's existence, or the extent to which Moriarty had notified Earth Tech or the City regarding the relationship.

[9] Appellants observe that Futrell and Canales's November 3, 2005 meeting with Watts occurred before the investigations were completed, and appellants contend that this demonstrates that the true basis for Futrell's actions was the appellees' involvement, not the relationship between Moriarty and Hyatt. However, the record evidence shows that at the time of Futrell's decision, the existence of the relationship had been substantiated and required no additional investigation. While conceding that the November 7, 2005 memo from David Allan Smith—the contents of which were publicly disclosed through a newspaper article—contained errors in its allegations concerning Moriarty and Hyatt, Futrell testified that "the one thing that did not change was the very distinct conflict of interest." Moreover, given that Futrell's stated concern was the perception of a conflict of interest, no further research was necessary to determine whether the relationship constituted an actual conflict of interest as a legal matter.

9

In *Bennett v. Computer Associates International, Inc.*, the defendant company had sued the plaintiff's employer for copyright infringement, and they eventually settled. 932 S.W.2d 197, 199-200 (Tex. App.—Amarillo 1996, writ denied). Meanwhile, the employer fired the plaintiff after he had admitted to copying the defendant's computer program code and the employer had independently confirmed the plaintiff's actions. *See id.* at 205. The plaintiff then asserted a claim against the defendant for tortious interference with his employment contract. *See id.* at 199. The Amarillo Court of Appeals held that summary judgment against the plaintiff on the issue of proximate cause was proper because the employer's testimony regarding the cause of termination (the plaintiff's copying copyrighted code) was "clear, direct, positive, and uncontradicted," and established that the employer "acted unilaterally upon information garnered through its own investigation." *See id.* at 205.

The same analysis applies here. Futrell's testimony that her decision to request Moriarty's removal was based on an existing romantic and financial relationship that could be perceived as a conflict was clear, direct, positive, and uncontradicted. This decision was made by Futrell and not by appellees, and was based on investigations conducted by both Futrell's office and independent third parties. There is no evidence or even allegation that the results of the investigation—as to the existence of the relationship—were inaccurate, an improper basis for requesting the project manager's removal, or a pretext for an unstated justification for Futrell's decision. We hold that appellees have demonstrated as a matter of law that the cause for the City's requesting Moriarty's termination was the existence of a romantic and financial relationship between him and Hyatt, not the appellees' original allegations that precipitated the City's investigations into the situation.

10

Appellants refer to various pieces of evidence in the record that, appellants argue, indicate appellees' actions were the reason why the confirmed existence of the relationship was cause for Moriarty's involvement with the ACWP to be terminated, which leads to the conclusion, appellants contend, that appellees' actions were a substantial factor in such termination.

Appellants refer to Watts's November 4, 2005 description of his meeting with Futrell and Canales. Watts stated that Canales, in discussing the "perceived conflict of interest," referred to a "perception among the contracting community." According to appellants, the contracting community consisted only of the six engineering firms and their representatives. Even if appellants' interpretation of the phrase "contracting community" is correct, Futrell testified without contradiction that she herself perceived the relationship to be a conflict of interest, that this conclusion was the basis for her decision, and that none of the appellees played an active role or substantial factor in her decision-making. There was also uncontradicted evidence that a perception of a conflict was a concern regardless of the perception's origin or scope, given that it could become more widespread. Susan Wynne, an assistant city auditor, testified that the ACWP-related allegations merited investigation because, due to the size of the project and amount of money involved, there was a "huge political risk" in relation to "the interaction with the public and the duty that we have to uphold their trust." Similarly, John Steiner, the City's integrity officer, testified that in the case of such "an important city program" the city manager had a responsibility to act as quickly as possible. In sum, there is no evidence that Futrell, by making reference to a perception of a conflict within "the contracting community," indicated that her focus was on the identity of that community rather than the conflict itself.

11

We also reject appellants' contention that there was evidence of additional contact between Futrell and appellees raising a reasonable inference that appellees were a substantial factor for Futrell's decision. Appellants refer to Futrell's testimony that "there were still people in the community that had concerns they didn't believe were resolved" as evidence that Futrell had additional meetings with appellees. However, Futrell's statement was in reference to the concerns expressed at the June 2005 meeting that remained despite the two prior police investigations and that, she had determined, required investigation to "put these concerns to bed." Appellants next refer to the fact that Futrell and Cis Myers (one of the representatives at the June 2005 meeting) belonged to an informal "networking group" of professional women who gathered at homes approximately four to six times a year, including during 2005. However, Myers testified that her only discussion with Futrell regarding Moriarty occurred at the June 2005 meeting, and there is no evidence to the contrary. Appellants also refer to the following email by one of the engineering firms' representatives (who is not a party to this appeal), sent on October 11, 2005: "Well, I went on the Denver trip with the Chamber and talked to both Bruce Todd and Toby—and this subject came up. Bruce said the results will definitely be made public whenever it's considered 'done.' We'll see." We find nothing in this email that would raise a reasonable inference that the referenced discussion with Futrell had any impact on her decision-making with regard to Moriarty.

Appellants also discuss the City's handling of unrelated conflicts of interest that came to light regarding City officials or projects, but that did not result in any substantial investigation and did not end in the alleged violator being terminated or otherwise disciplined. Appellants assert that the only difference between their alleged conflict and others was that "the persons making the allegations against the Appellants were large engineering firms with powerful lobbyists."

12

We note that appellants' assertion is contradicted by Futrell's testimony to the effect that the size of the ACWP was the cause for her treating the allegations regarding the program's project manager as a significant issue. More importantly, the evidence did not rise to a scintilla that the other conflicts alleged by appellants were sufficiently similar to Moriarty and Hyatt's situation so as to raise a reasonable inference that the original source of the allegations was a distinction of any significance. *Cf. Autozone, Inc. v. Reyes*, 272 S.W.3d 588, 593-94 (Tex. 2008) (for employment discrimination claim based on disparate discipline, compared employees' conduct must be "nearly identical," of "comparable seriousness"). For example, when Futrell hired her husband's brother-in-law, the City's integrity officer concluded there was no violation of the applicable nepotism policy. Another example is a case in which the principal of a company that was awarded a City contract was a City employee's husband, but that case occurred before Futrell became city manager. In addition, no action was taken where a department director was overseeing a contract performed by his wife because the director's retirement was already scheduled when the conflict was discovered. We also note that it is unclear that the conflicts raised by appellants, in which no disciplinary action was taken, were the only conflicts to have been identified by the City other than the one at issue in this lawsuit.[10]

### Conclusion

To raise a genuine issue of material fact, the evidence must transcend mere suspicion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). We conclude that appellants failed

---

[10] For example, there was testimony to the effect that an independent contractor of the City who had given a job or subcontract to his wife was terminated from his employment when this action was discovered.

13

to raise a genuine issue of material fact regarding whether appellees' conduct was a substantial factor in Futrell's decision to request Moriarty's removal from the ACWP. Having concluded that summary judgment was proper on the issue of proximate cause, we do not address appellants' remaining issues on appeal. We affirm the judgment of the district court.

_____

G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed: March 25, 2010

14