

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00334-CV

MIKE LEACH, APPELLANT

V.

CRAIG JAMES, ESPN, INC., AND SPAETH COMMUNICATIONS, INC., APPELLEES

On Appeal from the 99th District Court
Lubbock County, Texas
Trial Court No. 2009-550,359, Honorable William C. Sowder, Presiding

November 21, 2014

## Opinion

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

"There I go, turn the page."[1]

Before us once again is an appeal from Coach Mike Leach.  The dispute centers upon his termination as head coach of the Texas Tech University (University) football team.  This page of the story concerns his suit against Craig James (James), ESPN, Inc., and Spaeth Communications, Inc.  Leach sued the three alleging claims of defamation, tortious interference with a contract, and civil conspiracy to tortiously interfere with his contract.  Purportedly, all three uttered falsehoods against him as they endeavored to terminate or otherwise interfere with his contractual relationship with the

---

[1] "Turn the Page," Bob Seger.  With all due respect.

University. The three defendants filed separate motions for summary judgment. The trial court granted each and entered judgment denying Leach recovery. He then appealed.[2] We affirm.

*James/Spaeth*

James and Spaeth urged numerous grounds to defeat liability in their respective summary judgment motions. One, however, is dispositive. It pertains to causation. Both movants asserted that, as a matter of law, their conduct was not the legal or proximate cause of the University's decision to terminate its contract with Leach. This was allegedly so because the decision emanated from the University's own independent investigation into the incident. Citing our opinion in *Bennett v. Computer Assocs. Int'l,* 932 S.W.2d 197 (Tex. App.—Amarillo 1996, writ denied) and the opinion of the Austin Court of Appeals in *Moriarty v. Malcolm Pirnie, Inc.*, No. 03-08-00665-CV, 2010 WL 1170244, 2010 Tex. App. LEXIS 2205 (Tex. App.—Austin March 25, 2010, no pet.) (mem. op.), James and Spaeth believed that the University's investigation and the action undertaken subsequent thereto attenuated any causal link between James' effort to cause Leach to be fired and the actual firing.[3] We agree.[4]

---

[2] Leach did not appeal the entry of summary judgment upon his defamation claims. So, that aspect of the suit is not before us.

[3] Leach did not expressly address this ground in his appeal. That would normally require us to affirm the summary judgment. *Burnett Ranches, Ltd. v. Cano Petroleum, Inc.*, 289 S.W.3d 862, 870 (Tex. App.—Amarillo 2009, pet. denied) (stating that one appealing a summary judgment must illustrate why none of the grounds urged below support it). To the extent that his general allegations about causation can be interpreted as effort to discuss the topic, we consider the argument out of caution.

[4] It goes without saying that a defendant may defeat a cause of action via summary judgment by disproving, as a matter of law, one of its elements. *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998). Elemental to a claim of tortious interference with a contract is, among other things, proof that the interference in question proximately caused the injury of which he complains. *Id.* at 456; *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Proximate cause exists when the act is a substantial factor in bringing about the result. *Id.*

Akin to Leach here, the plaintiff in *Bennett v. Computer Assocs, Int'l* sued Computer Associates for tortious interference with contract and defamation. *Bennett v. Computer Assocs, Int'l,* 932 S.W. 2d at 199. The contract in question involved Bennett's employment agreement with Goal Systems International, Inc. and related compensation due from the same entity for computer programs it bought from him. Apparently, some of the programs contained code owned by Computer Associates. The latter sued Bennett's employer and ultimately settled that dispute. During this time, the employer also began its own investigation to determine whether Bennett had done that of which he was accused. The accusations were verified, and Bennett's employer fired him. Bennett then sued Computer Associates. The latter moved for summary judgment, and one of the various grounds urged involved causation or the lack thereof. Furthermore, the summary judgment record revealed that Bennett not only engaged in the misconduct of which he was accused but also that he was fired for doing so. This led us to conclude that Computer Associates "established, as a matter of law, that [the employer] acted unilaterally upon information garnered through its own investigation," *id.* at 205, as opposed to action undertaken by Computer Associates. In other words, Computer Associates may have initiated the investigation by pursuing its complaints about Bennett, but the findings from the ensuing investigation undertaken by his employer were the cause of his discharge.

Similarly, in *Moriarty v. Malcolm Pirnie, Inc.*, 2010 Tex. App. LEXIS 2205, at *6, the reviewing court was asked to assess whether summary judgment upon a claim of tortious interference was appropriate. Apparently, Moriarty was removed as project manager for a particular City of Austin project. The removal occurred after information about a relationship and potential conflict of interest between Moriarty and a third party

3

was revealed to the city by representatives of Malcolm Pirnie, Inc. The city manager investigated the allegation and confirmed the existence of a relationship posing such a potential conflict. Thereafter, she decided to remove Moriarty from the project. The reviewing court recognized that the summary judgment record contained evidence indicating that there may have been "errors in its allegations concerning Moriarty." *Id.* at *13 n.9. Nonetheless, the city manager testified that "'the one thing that did not change was the very distinct conflict of interest.'" *Id.* Moreover, her testimony that the decision was "based on an existing romantic and financial relationship that could be perceived as a conflict was clear, direct, positive and uncontradicted," according to the court. *Id.* at *15. And, given the absence of "evidence or even allegation that the results of the investigation—as to the existence of the relationship—were inaccurate, an improper basis for requesting the project manager's removal, or a pretext for an unstated justification for [the city manager's] decision," the court concluded that Malcolm Pirnie had "demonstrated as a matter of law that the cause for the City's requesting Moriarty's termination was the existence of a romantic and financial relationship . . . not the . . . original allegations that precipitated the City's investigations into the situation." *Id.* at *15-16.

We take from *Bennett* and *Moriarty* several observations. First, accusing an employee of impropriety and demanding his termination does not *ipso facto* mean the allegation proximately caused the employee's termination. Second, independent investigation undertaken by the employer (even if instigated by inaccurate accusations of misconduct) that creates or verifies basis for termination attenuates the legal nexus between the complaints instigating the investigation and the ultimate decision. However, the record must establish that the decision to terminate was based upon

4

considerations or circumstances arising from the independent investigation. In a summary judgment setting, evidence of the latter must be of sufficient ilk to permit such an inference as a matter of law; one cannot so infer based upon unclear or contradictory evidence.

Here, the record indisputably illustrated that James' son, an athlete on the University football team, suffered a concussion and did not participate in team practice. Noticing the student near or on the field wearing street clothes, Leach viewed him as a distraction and grew upset and concerned about his appearance and attitude. The coach did not want the student "loafing" while others were working.[5] So, he directed a subordinate to place the injured athlete in a dark place near the practice field and stand during the entire practice time. Leach acknowledged telling Steve Pincock to "'lock his fucking pussy ass in a place so dark that the only way he knows he has a dick is to reach down and touch it.'" The athlete was so secluded in an equipment shed for a period of time spanning from one to several hours, depending on who is believed. He was also directed to stand the entire time. Similar treatment occurred when the team next practiced; however, on that day the student was placed in a dark media room after the chairs were removed. Leach approved of this, according to the record.

---

[5] Leach rationalized his conduct thusly:

He had been a distraction and was violating team rules, so I wanted him away from the team. And as far as the darkness, you know, he had overly sensitive parents, so I wanted him out of the light. I wanted him somewhere where a ball or a body couldn't hit him, and I wanted him somewhere where he wouldn't exert himself to make sure that he was protected. But, you know, a portion of it is I wanted him away from the team because he was a distraction and defied team rules.

When asked if he had ever treated another athlete similarly, Leach answered "No, I didn't" and acknowledged never before directing a trainer to place an athlete suffereing from a brain concussion in a "pitch dark place."

Upon hearing of his son's treatment, James (a commentator for ESPN) contacted one or more University officials or board members and lodged a complaint. Whether then or later, it is clear that he demanded that Leach be fired as head coach of the team. That those to whom James complained knew of his connection to ESPN was clear. Furthermore, various University officials and regents were concerned about James' notoriety and the affect it and the complaint may have had on the University.

Shortly thereafter, the University assigned two individuals to conduct an investigation into the incident. Among those interviewed were James, his son, a team physician, Pincock, and Leach. The primary investigator (who was also an attorney with the University) was aware of the pressure James attempted to exert on University officials. She also testified, via deposition, that James appeared to be threatening a lawsuit if appropriate action was not undertaken. Nonetheless, she counseled the University chancellor, president, and athletic director that 1) this "was a matter that needed to be handled between the University and its employee, Mike Leach . . . and that whatever action they took should not be influenced by the Jameses" and 2) "[w]e needed to take the actions based on what we believed had happened and not on—and not based on what the Jameses did." The investigator also informed them that "there's not a lot in dispute" and that Leach "agreed with everything that was said and said that some of the language that was pretty rough he said 'that sounds like me, if I didn't say it, I wish I had . . . .'" Simply put, the investigation verified the substance of the complaint, though not each detail.

Those to whom the investigator reported arrived at a consensus that the action undertaken by Leach against the injured athlete was punitive in nature and inappropriate. As summarized by the University president when asked "what the"

material facts were that there was agreement on?”: 1) “that Adam James had received a concussion”; 2) “[t]hat - - at the practice the next day, he had been required to stand in a shed or something for most - - all of the practice or most of the practice”; 3) “that the subsequent day [he] had been required to do the same thing”; and 4) “that this was a punitive action.”[6]

The president initially decided to reprimand Leach. Then he decided that Leach should execute a letter of apology or as Leach described it, “some statement that, you know, that we can give to the Jameses to hopefully pacify them.” That option was discussed with Leach; he refused to sign a document indicating he acted improperly. Thereafter, the president suspended Leach. The decision to terminate him occurred after the coach approached the media about the situation. As explained by the president, “[o]n the evening of [December] 28th. . . [i]n response to our letter of suspension, [Leach] or his attorney . . . got [sic] on the news media disparaging Tech . . . we had hoped that the or I had hoped specifically that the - - that the letter of suspension would elicit cooperation. But it really didn't. And it appeared to me at that point the relationship was probably broken.” The president, further, stated that on “the morning of the 29th, I sat down with [the athletic director] and said . . . is this a relationship that can be repaired.” When the athletic director said “no,” “we made the decision to terminate.”

The athletic director confirmed that the president “and I came to [the] conclusion that we couldn’t fix this, that we needed to make the change.” He further commented that whatever various members of the board of regents desired or suggested was of no consequence to him. As he explained, “the board can express their views . . . give their opinions . . . [y]ou can call it pressure, whatever you want to call it,” but “[i]n the end we

---

[6] The University president had sole authority to discipline the head football coach.

have to make our decision . . . I've been in this job 13 years . . . [and] know the protocol . . . they couldn't fire the coach. That was [the president's] decision on my recommendation . . . he could make the decision without my recommendation if he wanted to." Yet, "we agreed we needed to make a change" or change "the way things were going and had gone."

That James actively pursued the termination of Coach Leach upon hearing of the incident involving his son is clear. Similarly clear is that not every aspect of James' description of the incident actually occurred as described. Yet, his complaint to the University spawned an investigation by that entity. The investigation revealed material or substantial aspects of the allegation to be accurate. Leach ordered that a student athlete suffering from a brain concussion be made to stand in a "pitch dark" room for two entire team practices. Such conduct was deemed mistreatment by those with authority to discipline the coach. Efforts were made to ameliorate the situation. They were rebuffed by the coach. Thus, he was suspended. The decision to terminate him was made after Leach approached the media about the situation. At that point and after consultation with his athletic director, the University official having sole authority over the discipline of Leach considered the University's relationship with him irreparable.

The testimony provided by both the president and athletic director explaining why Leach was fired was clear and direct. And while there may be insinuation that James' pressure may have influenced the outcome, it is just that . . . insinuation. The latter or conjecture or surmise is not the stuff upon which reasonable inference may be founded. *See Thompson & Knight LLP v. Patriot Exploration, LLC*, No. 05-13-00104-CV, 2014 WL 4072120, 2014 Tex. App. LEXIS 9164, at *31 (Tex. App.—Dallas August

8

19, 2014, no pet). Leach cites us to no evidence from which a rational juror can reasonably deduce that the University's president and athletic director actually succumbed to pressure exerted by James or others on his behalf. Nor does he attempt to illustrate that a rational juror could infer that calling a concussed player a "fucking pussy ass" and requiring that athlete to stand for long periods of time in a darkened room since he was "a distraction" who "defied team rules" was insufficient basis to warrant discipline or termination.[7]

As in *Bennett* and *Moriarty*, an independent investigation coupled with University action responding thereto intervened to attenuate the causal link between the conduct deemed tortious interference and the employee's dismissal, as a matter of law. The trial court did not err in granting James and Spaeth summary judgment on the issue of causation. And because ESPN also moved for summary judgment on that ground, the trial court did not err in granting that entity judgment.

Finally, the purported civil conspiracy urged at bar depended upon proof of a viable claim for tortious interference with contract. Since the trial court did not err in rendering judgment on that cause of action, it did not err when denying the conspiracy claim.

We affirm the summary judgment of the trial court denying Leach recovery against James, ESPN, and Spaeth.

                                        Brian Quinn
                                        Chief Justice

---

[7] We note that Leach also posited below that the decision to terminate him arose from animosities linked to prior contractual negotiations between him and the University. Yet, the evidence allegedly supporting that contention would be of no help to him. If believed, it only suggests that motives unrelated to the James' efforts caused his discharge, and it was James' efforts to have him fired that underlie his causes of action here.

9